Jean M. KLEVE, Appellant,

v.

GENERAL MOTORS CORPORATION and Harvey Ben Bjornson d/b/a Bjornson's Pontiac Company, Appellees.

No. 55747.

Supreme Court of Iowa.

Sept. 19, 1973.

John E. Miller, Baker, Miller & Baker, Humboldt, for appellant.

A. Roger Witke, Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, and James R. Hamilton, Storm Lake, for appellees.

RAWLINGS, Justice.

By products liability action plaintiff seeks recovery of damages from defend-

ants resulting from a single car accident allegedly due to a defective steering mechanism. Plaintiff appeals from directed verdict for defendants. We reverse.

In January 1965, plaintiff Jean M. Kleve (Kleve) purchased a new Pontiac from defendant Harvey Ben Bjornson, doing business as Bjornson's Pontiac Company (Bjornson). This automobile had been manufactured by defendant General Motors Corporation (General Motors). March 1, 1967, Kleve left Livermore and headed west toward Humboldt. At a midway point Kleve endeavored to turn his car to the right but something stuck which made the turn impossible. In an attempt to free the steering wheel he tried turning left sharply and then jerking to the right. Kleve was able to turn left but couldn't bring it back because the mechanism had locked. The car resultantly went into a ditch and finally struck some trees. Kleve was injured and the car wrecked.

The record before us reveals that at time of the accident the Pontiac had been driven about 24,000 to 26,000 miles. After purchase by plaintiff the power steering assembly on the vehicle had not been examined, repaired or modified by anyone.

Kleve identified exhibits H–T as power steering valves and controls removed from his wrecked car. These had been previously delivered by him to Robert Hankins for purpose of examination. Plaintiff stated the aforesaid exhibits had at one time been sent to Dr. Wardle at Ames for inspection, but on delivery to Hankins they were in the same condition as when removed from the Pontiac.

Hankins, for 33 years a vehicle mechanic, testified as an expert on Kleve's behalf. Upon completion of his testimony trial court sustained defendants' objections to plaintiff's evidential offer of exhibits H–T.

Subsequently, after plaintiff had rested, trial court also sustained a defense motion to strike all of Hankins' testimony.

Thereafter a directed verdict for defendants was entered pursuant to their motion.

In support of a reversal plaintiff asserts, trial court erred in (1) striking all of Hankins' testimony; (2) holding plaintiff failed to establish existence of any steering mechanism defect was the proximate cause of the accident and resulting damage; (3) holding applicability of the strict liability doctrine had not been established; and (4) sustaining defendants' directed verdict motion.

I. In Hawkeye-Security Insurance Co. v. Ford Motor Co., 174 N.W.2d 672, 684 (Iowa 1970), this court specifically adopted the principles found in Restatement, Second, Torts, § 402A, which provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

See also Annot., 13 A.L.R.3d 1057, 1066–1070.

■ II. Elements essential to establishment of a cause of action under the foregoing standard are (1) sale of a product by the defendant; (2) the product was in a defective condition; (3) the defective condition was unreasonably dangerous to the user or consumer; (4) the seller was en-

gaged in the business of selling such a product or products; (5) said product was expected to and did reach the user or consumer without substantial change in condition, i. e., the defect existed at time of sale; (6) said defect was the proximate cause of personal injuries or property damage suffered by the user or consumer; (7) damages suffered by the user or consumer. See W. Carmichael, "Strict Liability in Tort—An Explosion in Products Liability Law", 20 Drake L.Rev. 528 (1971). See also Practice Pointers, 13 A.L.R.3d 1057, 1066–1070, citing Emroch, Pleading and Proof in a Strict Products Liability Case, Insurance L.J. 581 (1966).

■ III. It is further understood the rule of strict liability in tort applies to a retailer as well as the manufacturer of a defective product. See Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168, 171–172 (1964); 63 Am.Jur.2d, Products Liability, §§ 145–148; 86 C.J.S. Torts § 18.1 (Supp. 1972).

■ IV. Additionally, the phrase "defective condition unreasonably dangerous to the user or consumer or to his property" found in Restatement, Second, Torts, § 402A means the defect in a product not contemplated by the user or consumer which would be unreasonably dangerous to him in the normal and innocent use or consumption thereof. See Restatement, Second, Torts, § 402A, comment (h); Farr v. Armstrong Rubber Company, 288 Minn. 83, 179 N.W.2d 64, 68–69 (1970); 20 Drake L.Rev. at 541–543. See also Annot., 13 A.L.R.3d 1057, 1077–1080.

Touching on the same subject 63 Am. Jur.2d, Products Liability, § 15, states in part:

"It has been held that proof that when it was put to normal use a product broke, causing injury, evidences the defectiveness of the material from which the product was manufactured. Similarly, it has been said that proof of a specific defect in the product is not an essential element in establishing a cause of action, and that where machinery malfunctions, it obviously lacks fitness, regardless of the cause of the malfunction."

See also Hunter v. Ford Motor Company, 37 A.D.2d 335, 325 N.Y.S.2d 469, 471 (1971).

■ It is further understood that under the strict liability in tort doctrine the party placing a defective product in the stream of commerce may be liable regardless of care exercised in the production thereof. Stated otherwise, strict liability in tort is not predicated on negligence. See Restatement, Second, Torts, § 402A, comment (m); Ritter v. Narragansett Electric Company, 109 R.I. 176, 283 A.2d 255, 260–263 (1971); Annot., 13 A.L.R.3d 1057, 1071–1077.

■ V. Without question the burden was upon plaintiff to prove the Pontiac was defective when it left the seller's hands. Proof of such defect need not, however, necessarily rest upon direct evidence. It can be and is usually established by circumstantial evidence. See Vandermark v. Ford Motor Company, 37 Cal.Rptr. at 898, 391 P.2d at 170; MacDougall v. Ford Motor Company, 214 Pa.Super. 384, 257 A.2d 676, 680 (1969); Barnett v. Ford Motor Co., 463 S.W.2d 33, 35 (Tex.Civ. App.—Waco 1970, no writ), 20 Drake L. Rev. at 544. See also Hunter v. Ford Motor Company, *supra*; Annot., 13 A.L.R.3d 1057, 1066.

■ Proximate cause may also be established in like manner. See MacDougall v. Ford Motor Company, *supra*.

With regard to the foregoing, rule 344(f)(16), Iowa R.Civ.P., states:

"An issue may be proven by circumstantial evidence; but this evidence must be such as to make the theory of causation reasonably probable, not merely possible, and more probable than any other

theory based on such evidence. Generally, however, it will be for the jury or other trier of the facts to say whether circumstantial evidence meets this test."

See also Robeson v. Dilts, 170 N.W.2d 408, 414 (Iowa 1969); State Farm Etc. Ins. Co. v. Anderson-Weber, 252 Iowa 1289, 1302, 110 N.W.2d 449 (1961).

VI. Another precept which instantly comes into play is thus stated in Hawkeye-Security Insurance Co. v. Ford Motor Co., 174 N.W.2d at 681:

"We hold age and type of use of a product are relevant factors to be considered in products liability cases of this type but they are relevant factors for the trier of the facts. Only in rare cases, or in absence of other proofs, are they controlling as a matter of law. (Authority cited)."

VII. And DeMoss v. Darwin T. Lynner Construction Co., 159 N.W.2d 463, 469 (Iowa 1968), expresses this basic principle applicable to our review of the instant case:

"In considering a motion for directed verdict * * * we are required to view the evidence in the light most favorable to the party against whom the motion is made. Rule 344(f) 2, Rules of Civil Procedure; True v. Larimore, 255 Iowa 451, 461, 123 N.W.2d 5, 10."

See also Leasing, Incorporated v. Gage, 199 N.W.2d 43, 44 (Iowa 1972); Schneberger v. Glenn, 176 N.W.2d 782, 784 (Iowa 1970).

VIII. Mindful of the foregoing we look now to the record at hand.

As heretofore revealed the Pontiac which Kleve purchased from the Bjornson agency was a General Motors product. This car had unquestionably been driven some distance prior to the accident here involved within that period of time no one had tampered with the power steering mechanism. Moreover, the vehicle had been used by Kleve in the manner for which it was produced, i. e., as a personal car. While it was being so operated the power steering mechanism locked, the car left the road, Kleve was injured and his Pontiac wrecked.

Furthermore, Kleve testified the steering assembly parts delivered by him to Hankins were in the same condition as when removed from the wrecked car. This identification sufficed since the involved vehicle parts were relatively impervious to change. See State v. Lunsford, 204 N.W. 2d 613, 616 (Iowa 1973), and citations. Moreover the aforesaid parts were identified and used by the expert witness for illustrative purposes only.

IX. Next to be considered is Hankins' testimony based upon his personal inspection of the aforesaid steering assembly components.

■ Trial court properly permitted this witness to testify as an expert in the field here involved. See 2 Jones on Evidence, Civil Cases, § 380 (4th ed.); M. McCormick, "Opinion Evidence in Iowa", 19 Drake L.Rev. 245, 256–271 (1970); 32 C. J.S. Evidence § 546 p. 90. See also Olson v. Katz, 201 N.W.2d 478, 481–483 (Iowa 1972).

Hankins had examined the internal working parts of the steering assembly and thereupon based his testimony as an expert. In course of testifying he had before him the aforementioned steering assembly parts and further identified each of them.

Inceptionally Hankins stated:

"Power steering is put on to a conventional steering gear to assist. It consists of a belt driven hydraulic pump to pump oil and valve to direct the flow of the oil and a piston that the oil reacts against to assist in steering. A power steering unit has certain basic parts. In this particular power steering the basic integral part is the mechanical drive right straight through. Exhibits H and I are part of this mechanical drive and Exhibit J is

rotated by the steering wheel which activates Exhibit I which moves Exhibit J against the gear inside of Exhibit K and turns the wheels. Exhibit K is the housing. Exhibit I is turned by the steering wheel and it is fastened by universal joint to the steering wheel. The remains of the universal joint are Exhibit N and it is fastened on the end of valve H and this one inside this block, and when it is turned it will go back and forth, these teeth against those and make the arm work. This works by hydraulic pressure from the pump which is in here, passes through this valve H and this piston J is inside the cylinder. Oil on this side causes the car to turn one way, oil on this side causes the car to turn the other way, so whatever controls the oil controls the direction."

Deeming such significant, relevant portions of Hankins' testimony, in question and answer form, are here set forth:

"Q. Now then, from your examination of these parts, other than those which are obviously broken in the wreck, but on the inside part, state whether or not you found any defects at all? A. The valve is now stuck. The shaft inside of it is bent and another thing, we saw in this Exhibit I the machining is worn off from one side and not on the other. By machining, I mean the lathe marks that formerly were all the way around and now they are only on the one side. A lathe is used to make the parts round and it has cutters on it, and these cutters leave little grooves. On Exhibit I there are matching marks on one side, and on the other side they are worn considerably.

"Q. Now, if there were—this part was in a lathe, and made round by a lathe, would the machining marks appear all the way around it, or just part-way around it, or how? A. Well, it, in my opinion, would be something not running true, not wearing where the part's running.

"Q. Mr. Hankins, Exhibit I, does it have any relationship to Exhibit H? A. Driven by it.

"Q. Does it fit in it, or on it, or—in some manner? A. It goes on the end of it.

"Q. Could you illustrate how it works? A. (Indicating) That's the way it should work. It don't fit correctly because it's not straight.

"Q. In operation, does Exhibit I move in and out of Exhibit H? A. Yes, that's what directs the flow of the oil. This has to—as you turn—as you turn it thus, it goes up and down.

"Q. Runs the oil up and down? A. Yes.

"Q. So Exhibit I should move freely in Exhibit H, then? A. Right.

"Q. Does it? A. No.

"Q. Now then, I believe you have testified that Exhibit J is inside Exhibit K? A. Right.

"Q. When properly put together. Where are Exhibit H and I; here's another part down here, which is marked Exhibit O? A. That is the pump that supplies the pressure.

"Q. Now, is the pump fastened in any way to Exhibit K? A. It's fastened; it puts the pressure into this one, and this is simply a return hose. Fastened by hoses.

"Q. With reference to Exhibits H and I, which is the valve, and whatever you call that other thing, what do you call Exhibit I? A. Worm.

"Q. Worm; okay. With reference to Exhibit H, which is a valve, and Exhibit I, which is the worm, where are they located with reference to Exhibit K? A. They're all inside of it."

Hankins then stated, in substance:

"I cannot find any external breaks on Exhibit K. The whole valve, or Exhib-

it H, goes inside Exhibit K. I have an opinion from an examination of these parts what would cause the milling marks on Exhibit I to appear on one side and not on the other. I would say it would indicate that something is not correctly aligned. A lack of milling marks is a sign of wear, and it is right on the top end of Exhibit H. These milling marks could not suddenly disappear. There is no indication from an examination of Exhibit I that said exhibit was battered or bruised or crushed or broken in any way by a sudden happening of any event, and Exhibit H at this time has a bent stem. I attempted to open and close this valve. I got it to start out and then I couldn't get it back in. I can move it a little now. The outside part has to turn, slide on there at the time when the steering wheel is turned.

"Q. Now then, assuming now that this valve didn't slide, what would happen to the power steering on the car? A. If this valve doesn't come back to center, the pump pressure will hold, when the car is turned in one direction it will keep on turning that way."

Hankins concluded his direct examination with testimony to this effect:

Valve H is a typical hydraulic valve. The same principles work on that valve as all other hydraulic valves and works with a fluid, and the fluid runs from the pump to the unit and back to the pump and around. It's the same fluid all the time. It is recommended that this fluid be changed, but I don't know how often. I would say around 25,000 miles, as it is the same type of fluid as in the automatic transmission. It is a sealed unit except for the cap where the fluid is added. This cap is on the pump and reservoir. As the milling would wear off the material that was worn off would circulate around through the oil, and foreign material in the oil could affect the operation of the valve, if particles got in the wrong place they wouldn't allow the valve to slide or return. These valves are built with considerable tolerance. They are well built; they have a neoprene ring. There is no way for foreign material to get into a power steering unit like this one except by erosion of metal from inside the unit, or by addition to the fluid through the filler opening.

X. Upon completion of Hankins' testimony Ruby Kleve was called and testified at length on plaintiff's behalf. Thereafter Kleve was recalled as a witness. Plaintiff then rested whereupon defendants, as aforesaid, moved to strike all of Hankins' exhibit related testimony, or in effect most of the evidence elicited from this witness.

■ We are satisfied trial court erred in sustaining this blanket motion. As aptly stated in Ferris v. Riley, 251 Iowa 400, 407, 101 N.W.2d 176 (1960):

"It is also appropriate to point out that if any of the testimony to which the motion to strike was directed was competent the motion would have been properly denied. We have often held that a blanket motion to strike testimony, part of which is proper and part improper, should be overruled. (Authorities cited)."

Accord, Schmitt v. Jenkins Truck Lines, Inc., 170 N.W.2d 632, 659 (Iowa 1969).

■ It is also to be understood, a motion to strike any evidence must be timely made, i. e., at the earliest opportunity after the ground of objection becomes apparent. See State v. Goff, 182 N.W.2d 921, 922 (Iowa 1971); State v. Shimon, 182 N.W. 2d 113, 115 (Iowa 1970); Ver Steegh v. Flaugh, 251 Iowa 1011, 1017, 103 N.W.2d 718 (1960). See also Staley v. Fazel Bros. Co., 247 Iowa 644, 650, 75 N.W.2d 253 (1956); 53 Am.Jur., Trial, § 153; 88 C.J. S. Trial § 139. See generally State v. Ware, 205 N.W.2d 700, 702 (Iowa 1973); Cogley v. Hy Vee Food Stores, Inc., 257 Iowa 1381, 1386, 137 N.W.2d 310 (1965).

XI. Neither is it instantly of any significance that at close of Hankins' testimony trial court cursorily sustained defendants' objection to plaintiff's offer in evidence of the steering assembly parts.

■■■ As heretofore noted Hankins predicated his opinion evidence upon a personal examination of these items. He further produced them in open court and there demonstrated, in presence of the jury, their respective operations, functional purposes, and to him the apparent accident causing defect. The jury was thus in a position, had it been so allowed, to determine the foundational facts upon which Hankins based his opinion testimony and to properly evaluate same. This sufficed. See Heth v. Iowa City, 206 N.W.2d 299, 302–303 (Iowa 1973), and citations; Brissette v. Milner Chevrolet Company, 479 S. W.2d 176, 181 (Mo.1972). Any other view would, in effect, serve to unreasonably preclude the testimonial use of experts regarding things destroyed or of such nature as to preclude the production of same in a courtroom.

■■■ XII. Viewing the aforesaid evidence in that light most favorable to Kleve we are satisfied his bizarre experience with the Pontiac's steering system, as related by him, coupled with Hankins' testimony regarding the bent and abnormally worn sealed stub shaft served to circumstantially create a strict liability jury issue on the part of these defendants to this plaintiff.

Trial court committed reversible error in sustaining the directed verdict motions interposed by defendants General Motors Corporation and Harvey Ben Bjornson, d/b/a Bjornson's Pontiac Company.

Reversed and remanded for a new trial.

All Justices concur, except MOORE, C. J., and LeGRAND, and MASON, JJ., who dissent.

LeGRAND, Justice (dissenting).

I dissent from the result reached by the majority and from the reasoning upon which it is based.

It seems clear that without the testimony of the witness Hankins, plaintiff would have failed to make out a jury case. The trial court sustained defendant's motion for directed verdict after first striking all of Hankins' testimony. Therefore, the decisive issue in the case is the propriety of the trial court's ruling in excluding Hankins' testimony and in refusing admissibility of the exhibits upon which it was based. In both instances, I think the court was right.

The ruling which excluded the exhibits was in response to a motion which pointed out there was no showing the exhibits were in the same condition when examined by the witness Hankins as they were immediately after the accident. The merit of this objection is beyond argument on the record before us. The accident occurred in 1967. The exhibits were delivered to Hankins in 1971, two weeks before trial. From an examination of the exhibits, Hankins, a mechanic whose general qualifications are not disputed, undertook to advance a theory which ascribed the accident to a defective steering mechanism. However, in the long interval between the accident and Hankins' examination of the exhibits, they had been in the possession of one Professor Wardle at the Iowa State University. He, too, made tests, but he was not used as a witness at the trial of the case.

There is no showing in the record as to the condition of these exhibits when they were delivered to Wardle, how long he had them, whether he made any changes in them during his examination and testing, or whether they were in the same condition when returned as when delivered.

In fact, plaintiff, the only person who undertook to establish a foundation for the

admission of the exhibits, although first testifying to some of these circumstances eventually admitted there was no way he could tell the condition of the exhibits at the critical times.

I submit there is no authority for permitting the introduction of exhibits which, for all practical purposes, are decisive of important litigation when there is no showing that the exhibits are authentic and when the evidence affirmatively discloses they have been lying around various homes and offices for more than four years with no protective measures to assure their integrity at trial.

I think the failure to produce Professor Wardle as a witness in order to furnish, if he could, this vital information is fatal to plaintiff's attempt to use the exhibits and the testimony of Hankins.

Neither can I agree that defendants are without a remedy here because they failed to make timely objection. I believe they did and that it went to the very point— failure to account for the condition of the exhibits—upon which the trial court excluded the exhibits and struck out Hankins' testimony. Defendants are not required to make repeated objections to the same kind of evidence in order to preserve their record. See State v. Evans, 193 N.W.2d 515, 518 (Iowa 1972).

The majority also discounts the motion to strike Hankins' testimony at the conclusion of plaintiff's case as too general to be considered here. Contrary to the majority's statement, defendants did not move to strike all of Hankins' testimony. The motion asked only that the portion relating to the challenge exhibits be stricken. The exhibits had by then been excluded and the objection, limited as it was to them, was clearly sufficiently definite and specific.

We have often said the introduction of expert testimony lies largely within the discretion of the trial court. Heth v. Iowa City, 206 N.W.2d 299, 302 (Iowa 1973); Fischer, Inc. v. Standard Brands, Inc., 204 N.W.2d 579, 582 (Iowa 1973); Wolf v. Murrane, 199 N.W.2d 90, 96 (Iowa 1972). Under the record now before us, I am at a loss to see how that "broad discretion" mentioned in Wolf v. Murrane has been abused.

I would affirm the trial court.

MOORE, C. J., and MASON, J., join this dissent.