David J. HAUMERSEN, Administrator of the Estate of Charles D. Haumersen, Deceased, and David J. Haumersen, natural father of Charles D. Haumersen, Deceased, Appellees,

v.

FORD MOTOR COMPANY, Appellant.

No. 2–58043.

Supreme Court of Iowa.

Aug. 31, 1977.

**10** 

Lane & Waterman, Davenport, for appellant.

Betty, Neuman, McMahon, Hellstrom & Bittner by Richard M. McMahon and Larry L. Shepler, Davenport, and Doumar, Pincus, Knight & Harlan, Norfolk, Va., for appellees.

MOORE, Chief Justice.

This is an appeal from judgments on jury verdicts in an action predicated on strict liability. It involves an accident in which a car went out of control in a school yard, striking and killing a seven-year-old boy. Ford Motor Company manufactured the car. David J. Haumersen is the administrator of the child's estate and father of the child. He sues in both capacities.

The accident occurred on October 24, 1972, in the parking lot of Harrison School in Davenport, Iowa. Barbara Jo Woodford, the operator and one of the owners of the 1968 Thunderbird car involved in the accident, was dropping off two of her children at the school. Immediately preceding the fatal accident, Mrs. Woodford was involved in a minor incident in which her foot apparently slipped off the brake causing her to bump the car in front of her. After conversing with the other driver, she returned to her car and prepared to leave. Although the evidence was conflicting, the jury could find that Mrs. Woodford placed her car in gear and started to accelerate when the car suddenly lurched out of control, jumped the curb, hit several children including the decedent, and finally came to rest against the school building. Skid marks on the pavement and grass at the scene indicated Mrs. Woodford attempted to brake but was unable to overcome the rapid acceleration.

Following the accident, investigators discovered two broken motor mounts on the car. Investigation focused on the possibility that the broken mounts allowed the engine to rotate in such manner as to cause impingement on the throttle mechanism and rapid acceleration—accelerator "hang up." In tests soon after the accident, however, the throttle impingement was not duplicated.

Plaintiffs filed suit against several defendants on several theories of liability. Ultimately the matter went to trial against Ford alone with strict liability as the sole basis for recovery.

During trial, plaintiffs presented evidence that Mrs. Woodford struck a chuckhole about three days prior to the accident. She characterized the impact as severe. Plaintiffs theorized that the motor mounts broke on impact with the chuck-hole. Plaintiffs further claimed that the bump with the vehicle immediately prior to the school-yard accident threw the motor forward and that when Mrs. Woodford attempted to depart after the bump the engine rotated in such a way as to impinge on the throttle and cause the rapid acceleration. Plaintiffs claimed Ford defectively manufactured the vehicle and the accident occurred as a result.

Ford denied any defect in the car. It relied heavily on the inability of investigators to duplicate such an occurrence with the vehicle. Additionally, it argued that the incident with the chuck-hole was not significant and that the breakage of the motor mounts occurred on impact with the school building.

The jury returned a verdict of $100,000 for the estate of the child and $60,000 for the father. Ford appealed on several grounds: (1) the trial court's failure to exclude, for insufficient foundation, the opinion of plaintiffs' expert witness as to the cause of the accident, (2) the trial court's exclusion of Ford's proffered evidence of experiments and testing, (3) an alleged pattern of one-sided rulings by the trial court constituting abuse of discretion, (4) existence of a superseding cause in the driver's failure to inspect the vehicle following the impact with the chuck-hole, (5) inapplicability of the doctrine of strict liability to third-party bystanders, and (6) excessive damages.

I. Plaintiffs' expert witness John Talbott described conditions he observed in an inspection of the vehicle in May 1974, some 12,000 miles after the accident. He found a tear in the insulation above the air cleaner, scoring on the radiator showing it had been in contact with the fan, marks on the downshift rod indicating it had impinged on the heater housing, and a dent apparently made by a bracket about two inches forward of the bracket's normal resting position. Talbott also testified that the appearance of the car at the time of his inspection, including road film and wear on the new motor mounts which were installed, indicated as "most highly probable" that the conditions he described all occurred at the time of the accident in question. Ford did not object to any of this testimony.

Subsequently, plaintiffs attempted to introduce photographs depicting the conditions Talbott had described. At this point, Ford objected claiming a lack of foundation showing that the condition of the car as observed by Talbott and as depicted in the photos was the same as immediately after the accident. The trial court overruled this objection and admitted the photos, indicating that they merely depicted what Talbott had already described without objection.

Thereafter, following a long hypothetical question and over Ford's objection, the trial court allowed Talbott to give his opinion concerning the cause of the school-yard accident. In essence, Talbott opined that the impact with the chuck-hole broke the motor mounts; that the bump with the car immediately preceding the accident threw the engine forward two inches; and that thereafter when the driver accelerated, the engine rotated resulting in an impingement on the throttle mechanism and causing the throttle to remain open and ultimately to bring about the accident.

Ford now contends that for want of foundation, the trial court erred in admitting Talbott's opinion. Specifically, Ford contends that no evidence was adduced to show that the condition of the car at the time of Talbott's observations was the same as at the time of the accident. See 2 Barzelay & Lacy, Scientific Automobile Accident Reconstruction, 1404.102–.103 (1976). Additionally, Ford maintains that the lack of evidence as to handling and maintenance of the vehicle during the 18-month and 12,000-mile period between the accident and Talbott's inspection made the evidence inadmissible.

We discussed the legal principles governing opinion evidence in recent cases. *Doe v. Ray,* 251 N.W.2d 496 (Iowa); *Becker v. D & E Distributing Co.,* 247 N.W.2d 727 (Iowa); *Miller v. International Harvester Co.,* 246 N.W.2d 298 (Iowa). Iowa is committed to a liberal rule which allows opinion testimony if it is of a nature which will aid the jury and is based on special training, experience, or knowledge with respect to the issue in question. The receipt of such evidence rests largely in the discretion of the trial court and its ruling will not be disturbed absent manifest abuse of that discretion. The court's discretion is not unlimited. The facts upon which the expert bases his opinion must be sufficient to enable the witness to express an opinion which is more than mere conjecture. Irrespective of the manner in which the opinion question is phrased, the opinion remains such and the trier of fact is at liberty to reject it. Only in clear cases of abuse is admission of such evidence found prejudicial. *Doe v. Ray,* supra; *Miller v. International Harvester Co.,* supra; *Tiemeyer v. McIntosh* 176 N.W.2d 819, 823 (Iowa).

Talbott testified without objection concerning his observations of the vehicle. Additionally, as to a foundation for an assumption that the condition of the vehicle was the same as immediately after the accident, the following testimony was received, without objection:

Q. [Plaintiff's attorney] Now, what, in response to Mr. Waterman's [defendant's attorney] query, would you have— what evidence do you have or what is your opinion that this condition as you saw it on the car incidentally with ninety-four thousand on it, Mr. Waterman, existed at the time of the accident? A. First it had been there for a while because of

the road film. It wasn't of recent origin because the road film and dirt that accumulated on it. That is completely consistent with a—a forward movement that would have—the engine would have had to have moved forward in order for the fan to have struck the rear of the radiator. It was consistent with the rotation of the engine because you have the abrasions on the inner surface of the kick down and down shift rod. All of these fit so closely in my judgment make it most highly probable that they occurred in the same event.

The record contains other factors: Mrs. Woodford's testimony concerning the severity of the impact with the chuck-hole; testimony that conditions Talbott observed could not have occurred unless the motor mounts were broken; testimony that new motor mounts were placed on the car immediately following the accident; and testimony that when Talbott observed the vehicle, the motor mounts were intact and appeared to have "very close to 12,000 miles" on them.

■ Although the lapse of time between the accident and the observations of Talbott reduced the weight of Talbott's opinion, and although admission of his opinion went to the outer limits of the trial court's discretion, we are unwilling to hold that the trial court abused its discretion. The evidence did provide some basis for a rational belief that the conditions Talbott related were present at the time of the accident; thus the facts on which he based his opinion were sufficient to enable him to express an opinion which was more than mere conjecture. *Ganrud v. Smith,* 206 N.W.2d 311 (Iowa). On this subject generally see 3 Barzelay, Scientific Automobile Accident Reconstruction, 27–4–28–17 (1976); 2A id., 1404.343–.383.

II. At trial Ford proffered considerable demonstrative evidence concerning experiments and testing it conducted on comparable motor mounts and on a similar 1968 Thunderbird, in attempts to reproduce the accident. On three grounds the trial court sustained objections to this evidence: (1) a

previously entered protective order barring such evidence as a sanction under the rules of discovery, (2) a failure to show substantial similarity of circumstances between the experiments and the accident including, particularly, similarity between the test vehicle and the vehicle involved in the accident, and (3) the cumulative nature of the experiments: the results obtained from the experiments with the second vehicle were similar or identical to the results obtained from experiments performed on the vehicle involved in the accident which had already been shown at trial.

Ford asserts the trial court erred in excluding the proffered evidence. It contends that the trial court abused its discretion in entering the protective order prohibiting the evidence and that the circumstances present in the experiments were no less similar than the circumstances existent when plaintiffs' expert examined the accident vehicle about 12,000 miles and 18 months after the accident.

We find no necessity to go beyond the protective order. Plaintiffs commenced this action May 9, 1973. On February 15, 1974, the trial court assigned the case for trial on November 18, 1974. The court further ordered that all interrogatories be answered by March 29, 1974, and all depositions be completed by August 1, 1974. On September 27, 1974, the court further ordered that the parties meet for marking and identifying exhibits for trial, and that all discovery be completed and all motions directed to discovery be filed and ruled upon prior to November 4, 1974.

The parties engaged in a large amount of discovery. Included were numerous interrogatories from plaintiffs to Ford under rule 126 of the Rules of Civil Procedure. Many of these interrogatories Ford did not answer for various reasons including alleged inability to understand the questions, vagueness of questions, and lack of knowledge by Ford.

Many of the questions concerned the existence of previously-reported similar motor-mount and accelerator problems, testing conducted by Ford on similar motor

mounts, and exhibits and models Ford planned to use at trial. None of these questions was answered, as Ford claimed lack of knowledge or inability to provide answers because of the alleged burden involved. None of Ford's answers was supplemented by further explanation.

The court granted a motion to compel Ford to answer plaintiffs' interrogatories and ordered Ford to do so. Following the first set of answers we have described, plaintiffs filed a second motion to compel answers, and the court entered a second order to answer. Ford answered some of the interrogatories a second time pursuant to the order, but again gave no specific answers to several of the questions including those concerning its prior testing of motor mounts.

On October 31, 1974, counsel for the parties met for the purpose of marking exhibits. At that time, Ford indicated it intended to introduce, among other things, a 1968 Thunderbird, a motor presumably from a Thunderbird, a mock-up of a motor and motor mounts, certain movies of motor mounts showing motor-mount testing and manufacturing, and certain other movies showing Ford production lines. Prior to that time, Ford had given no indication it possessed another 1968 Thunderbird, what type of motor-mount testing it had conducted, or what exhibits, if any, it intended to offer.

On November 15, 1974, plaintiffs moved for and the trial court granted a protective order directing that Ford not be allowed to introduce any of the demonstrative exhibits it first revealed at the October 31 meeting. After reviewing the events we have described, the trial court concluded that Ford had "failed to comply with prior Orders of Court with regard to answering the interrogatories and in regard to timely disclosure and production of evidence it intend[ed] to use at the trial of this case." The court further concluded Ford had failed to "comply with the Rules of Civil Procedure and the specific orders of the Court to effectuate the policy established by those rules and disclose and produce evidence in a timely manner to effectuate justice between the parties.". In the issuance of this order Ford contends the trial court abused its discretion and wrongfully excluded evidence.

Sanctions for failure to make discovery are authorized by rule 134, R.C.P. Subparagraphs (a)(2) and (a)(3) of that rule state:

(a) *Motion for order compelling discovery.* A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery as follows: . . .

(2) *Motion.* If . . . a party fails to answer an interrogatory submitted under rule 126 . . . the discovering party may move for an order compelling an answer . . . .

(3) *Evasive or incomplete answer.* For purposes of this subdivision an evasive or incomplete answer is to be treated as a failure to answer.

Then subparagraph (b)(2)(B) states:

(2) *Sanctions by court in which action is pending.* If a party or an officer, director, or managing agent of a party or a person designated under rule 147 "e" to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision "a" of this rule or rule 132, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . .

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, *or prohibiting him from introducing designated matters in evidence* . . . . (Italics added.)

We have in several cases had occasion to review sanction orders under this rule. See *Sandhorst v. Mauk's Transfer, Inc.,* 252 N.W.2d 393 (Iowa); *Smiley v. Twin City Beef Co.,* 236 N.W.2d 356 (Iowa); *Bos Lines, Inc. v. Phillips & Phillips,* 226 N.W.2d 819 (Iowa); *Zimmerman v. Purex Corp., Ltd.,* 256 Iowa 190, 125 N.W.2d 822. In each case, we held the order to be within the discretion of the trial court. We recog-

nized that a party's failure to comply defeats the purpose of discovery by reducing access of the moving party to relevant evidence and leaving the actual grounds of the controversy ill-defined prior to trial. A party's failure to answer need not be willful in order to bring about sanctions, and we will not reverse the imposition of sanctions unless the court abuses its discretion.

In the present case the trial court found Ford had failed to reveal relevant information concerning its motor-mount testing procedures. Ford denied ability to point to any single tests, yet in the meeting on October 31, 1974, it presented movies of specific testing procedures, and in its offer of proof at trial its expert testified he had previously conducted specific tests in response to a United States Senate inquiry "to determine the result of any broken engine mounts in Ford products." Further, as late as September 1974 Ford's expert denied in a deposition that Ford had obtained or had access to a similar 1968 Thunderbird, yet at the October 31 meeting Ford indicated for the first time an intention to introduce such a vehicle into evidence.

■ Our review of the record satisfies us that the trial court did not abuse its discretion in imposing the sanction. The situation is unlike *Zimmerman v. Purex Corp., Ltd.*, 256 Iowa 190, 125 N.W.2d 822. Here the trial court had established time tables for completion of discovery. Ford did not follow those time tables. Under these circumstances, and while the court's ruling was severe, we find trial court did not abuse its discretion in issuing the protective order. Hence no basis for reversal exists for excluding the evidence in question.

■ III. In its third argument, Ford contends that even if its individual assignments of error are not grounds for reversal, a pattern of one-sided rulings by the trial court requires reversal. Similarly, Ford contends the trial court made "split-rulings" on evidentiary issues, allowing plaintiffs to introduce evidence on issues while denying Ford the same right.

One of Ford's main complaints concerns the protective order issued by the court excluding demonstrative evidence. We have already considered this subject and found the court's action to be within its discretion. Ford cites numerous other rulings by the court, but admits "no individual ruling may necessarily be an abuse of the court's discretion." Plaintiffs in turn cite numerous instances in which the court ruled in Ford's favor, arguing such examples show the court's rulings were not one-sided.

Our review of the record convinces us Ford's claim of mistreatment is not meritorious. Certainly the parties may not have received a *perfect* trial, but we believe the parties received a *fair* trial under all the circumstances. We hold that the rulings Ford points to do not constitute grounds for reversal individually or collectively. Similarly, we do not find merit in Ford's argument that the court engaged in split-rulings.

IV. Mrs. Woodford, the driver of the car, testified she hit a large chuck-hole about three days prior to the school-yard accident. She indicated the impact was severe and that she thought at the time she could have knocked the front end out of alignment. Plaintiffs argued to the jury that the defective motor mounts broke during the impact with the chuck-hole and that this resulted in the accident at the school. Ford presented evidence and based its case on the theory the motor mounts broke as a result of contact with the school building after the accident and the chuck-hole incident was unrelated to the school yard accident.

On this appeal, Ford asserts that Mrs. Woodford's failure to inspect the vehicle or even report the incident after striking the chuck-hole constituted an intervening event which it could not anticipate and for which it cannot be held responsible; hence an intervening cause exists which negates liability to plaintiffs. According to Ford's reply brief, the issue is "whether a chuck-hole that causes a 'severe' impact and makes the driver think she might have knocked the front end out of alignment is one which would at least require the user to

have the vehicle checked to ascertain its condition after such an impact and whether such inaction is an intervening or superseding cause."

We have here a problem of legal cause. "The ordinary tort rules of causation are applicable in products liability cases, whether the basis of recovery is negligence or strict liability." 72 C.J.S. Supp. Products Liability § 30 at 46. See *Kleve v. General Motors Corp.,* 210 N.W.2d 568, 571 (Iowa) (elements of cause of action under strict liability include requirement that defect be a proximate cause of personal injuries or property damage suffered). Hence we look to negligence cases for guidance in determining whether the intervening events negated Ford's liability.

■ A superseding cause "is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement, Torts 2d § 440. See *Schnebly v. Baker,* 217 N.W.2d 708 (Iowa). In order for an intervening act or force to relieve an individual from liability, it must not have been a normal consequence of his acts or have been reasonably foreseeable. *Leaders v. Dreher,* 169 N.W.2d 570 (Iowa); *Webber v. E. K. Larimer Hardware Co.,* 234 Iowa 1381, 15 N.W.2d 286; Restatement, Torts 2d § 447. This court stated in *Burk v. Creamery Package Mfg. Co.,* 126 Iowa 730, 734, 102 N.W. 793, 795:

> In applying this doctrine to cases where there is an intervening agency, it is generally held that the intervening act of an independent voluntary agency does not arrest causation, nor relieve the person doing the first wrong from the consequences thereof, if such intervening act was one which would ordinarily be expected to flow from the act of the first wrongdoer.

In the present case, viewing the facts in the light most favorable to the verdict, Ford manufactured a defective vehicle having motor mounts which broke upon impact of the vehicle with a chuck-hole thereby causing the accelerator to hang up. Following the impact with the chuck-hole, the operator failed to have the vehicle inspected or report the incident, although she knew the impact was severe.

■ We think Mrs. Woodford's inaction cannot be considered superseding as a matter of law. The following statement is applicable from *Fredericks v. American Export Lines, Inc.,* 227 F.2d 450, 453 (2nd Cir.):

> That the intervening purchaser will remain passive or otherwise fail to do what he ought to do to prevent the course of events, is a reasonably foreseeable consequence of the original wrongdoing. Moreover, this is not a distinction based upon mere passivity but rather upon whether or not the ultimate fact or occurrence is reasonably foreseeable. This is a far cry from the doing of something or the refraining from doing something constituting an improbable, independent, intervening cause, which is a superseding cause and breaks the sequence.

See also Restatement, Torts 2d, §§ 393, 396; Prosser, Law of Torts, § 102 at 670 (4th Ed.). Under particular facts, intervening conduct may be so manifestly superseding in nature as to cut off liability for a defendant's prior actions as a matter of law. But when facts are in dispute or room exists for reasonable difference of opinion as to whether the conduct is intervening, the question is for the jury. *Schnebly v. Baker,* 217 N.W.2d 708 (Iowa); Restatement, Torts 2d § 453, Comments *b* and *c*; 57 Am.Jur.2d Negligence § 198 at 569; 65A C.J.S. Negligence § 264 at 926–927. Reasonable minds may differ here on the question of the foreseeability of the driver's failure to check for broken motor mounts. The trial court properly submitted the causation issue to the jury. We find no basis for reversal on this point.

V. In its fifth argument, Ford contends that the doctrine of strict liability was not available to the deceased, as he was a bystander and neither an owner nor user of the Thunderbird car.

■ This argument presents a question of first impression in Iowa, although the United States Court of Appeals for this circuit, applying Iowa law, predicted that this court will extend the doctrine of strict liability to bystanders. *Passwaters v. General Motors Corp.*, 454 F.2d 1270 (8th Cir.). After examining the relevant cases and materials and considering the rationale for strict liability, we now bear out the Court of Appeal's prediction and extend the doctrine of strict liability to the protection of bystanders. See particularly *Hawkeye-Security Ins. Co. v. Ford Motor Co.*, 174 N.W.2d 672 (Iowa).

We think the reasoning of the California Supreme Court is persuasive, as stated in *Elmore v. American Motors Corp.*, 70 Cal.2d 578, 586, 75 Cal.Rptr. 652, 657, 451 P.2d 84, 88:

> It has been pointed out that an injury to a bystander 'is often a perfectly foreseeable risk of the maker's enterprise, and the considerations for imposing such risks on the maker without regard to his fault do not stop with those who undertake to use the chattel. [A restriction on the recovery by bystanders] is only the distorted shadow of a vanishing privity which is itself a reflection of the habit of viewing the problem as a commercial one between traders, rather than as part of the accident problem.' (2 Harper and James, The Law of Torts (1956) p. 1572 Fn. 6.)

> If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable. Consumers and users, at least, have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made contrary to the position of defendants, to extend greater liability in favor of the bystanders.

Cases from other jurisdictions which have considered this problem are collected in Annotation, 33 A.L.R.3d 415.

The present case is not controlled by the 1964 decision of *Hahn v. Ford Motor Co.*, 256 Iowa 27, 33, 126 N.W.2d 350, 354 ("there is no implied warranty of fitness from the manufacturer or dealer to members of the general public"). That case was not predicated on the doctrine of strict liability which this court adopted in 1970 in *Hawkeye-Security Ins. Co. v. Ford Motor Co.*, supra.

We find no basis for reversal at this point.

VI. The final issue involves the amount of damages. Ford contends the awards of $100,000 to the estate of deceased and $60,000 to deceased's father for loss of services, companionship, and society constitute excessive amounts which are unsupported by the evidence, warranting remittitur, or which are the result of passion and prejudice, necessitating a new trial. *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 659 (Iowa).

■ Similar damage questions have been considered by this court. See *Schmitt v. Jenkins Truck Lines, Inc.*, supra; *Wardlow v. City of Keokuk*, 190 N.W.2d 439 (Iowa); *Pagitt v. City of Keokuk*, 206 N.W.2d 700 (Iowa); *Turner v. Jones*, 215 N.W.2d 289 (Iowa); *Giltner v. Stark*, 219 N.W.2d 700 (Iowa); *Olsen v. Drahos*, 229 N.W.2d 741 (Iowa); *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421 (Iowa). The assessment of damages is traditionally a jury function and courts intervene only for compelling reasons. Where a verdict is within the evidence we will not disturb the jury's award.

■ A. The first of the two separate awards was to the decedent's estate. As the trial court correctly told the jury, the measure of damages is the present value of the estate which decedent would reasonably be expected to have accumulated as a result of his own efforts from the date of his

majority if he had lived out the normal term of his life.

Considerable evidence was presented by plaintiffs in an effort to give the jury a foundation on which to make an award. Briefly stated, this evidence showed Charles Haumersen was a seven-year-old of above-average characteristics. He was described as "very intelligent" and "all-American." He received high marks in school. He was active in church affairs and participated in recreational and athletic events, often with children older than himself. In addition, he had an unusual talent for creating humorous cartoons and other drawings, some of which plaintiffs introduced at trial.

■ Plaintiffs also presented a well-qualified economist who opined a child of decedent's characteristics, background, and family history could reasonably be expected to have a net equity accumulation in his lifetime with a present value as high as $101,343, which he termed a conservative maximum estimate. Ford cross-examined plaintiffs' expert thoroughly, but presented no contradicting evidence. Ford contends that the expert's opinion was based on an assumption decedent would attend college. Under all of the facts, however, this assumption was not unwarranted and was for the jury to decide.

The record does not disclose passion and prejudice. The key question is whether the verdict of $100,000 has support in the evidence.

Upon analysis of the record, we conclude that we should not disturb the award. Ford argues the amount is wholly out of proportion with past cases. But as we have previously stated, comparison of cases in this area is of little value; each case must be considered on its own facts. Charles was an unusually fine and able child. The award was within the limit of the opinion expressed by the expert witness and, although the opinion does not bind the jury, it is a relevant consideration. The verdict, although large, is not so excessive as to shock the conscience or exceed the evidence. We will not interfere.

B. The second award is for $60,000 in favor of decedent's father for loss of services, companionship, and society. Ford again argues the amount is excessive and unsupported by the evidence. Particularly, Ford contends that inasmuch as plaintiffs presented no evidence concerning the cost of maintenance of decedent to majority, no justification exists for *any* award to the father as parent.

The damage rules already discussed are equally applicable to the present issue. So long as the award is not so excessive as to exceed the reasonable range of amounts shown by the evidence, or the result of passion or prejudice, we will not disturb the verdict. *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632 (Iowa); *Pagitt v. City of Keokuk*, 206 N.W.2d 700 (Iowa).

■ This court set out the elements of damages of a parent for the death of a minor child in *Wardlow v. City of Keokuk*, 190 N.W.2d 439 (Iowa). The measure of damages for loss of services is the present value of what the decedent would have earned during minority minus the present value of the cost of his support and maintenance during such period. Additionally, loss of companionship and society of the minor during his minority is a proper element to be considered in fixing the amount awarded for loss of services.

In attempting to place a value on the loss of Charles, both of the parents testified as to the close relationship of the family. Plaintiffs introduced other testimony concerning decedent and his relationship with his parents. No evidence was presented by either party concerning the cost of maintenance of decedent during minority.

■ The first question for consideration is whether plaintiffs should be barred from receiving any award for loss of services where no evidence appears in the record as to the cost of maintaining decedent through his minority. The present value of such costs are to be deducted from recovery, but does a plaintiff have an affirmative duty to present evidence of such costs and can a defendant fail to present such evidence

himself and still object on this ground on appeal? Other jurisdictions have considered this question and concluded that absence of evidence as to the cost of maintenance does not bar recovery for loss of services. See *Wiezorek v. Ferris*, 176 Cal. 353, 167 P. 234; *Lake Erie & W.R.R. v. Chriss*, 57 Ind.App. 145, 105 N.E. 62; *Smyth v. Hertz Driv-Ur-Self Stations, Inc.*, 93 S.W.2d 56 (Mo.App.); *Burns v. Eminger*, 84 Mont. 397, 276 P. 437; *Rio Grande, E.P. & S.R.R. v. Dupree*, 56 S.W.2d 900 (Tex.Civ. App.). We hold the following language to be controlling, from *Smyth v. Hertz Driv-Ur-self Stations, Inc.*, supra, at 60:

> Appellant also complains of the fact that there was no evidence from which the jury might have estimated the cost of the support of plaintiffs' minor son until he would have attained his majority, and consequently urges that for want of such evidence the instruction served to give the jury a roving commission to assess such damages as they might see fit without proper regard to the compensatory nature of the award. In other words, while conceding, as it must, that the basis laid down for the assessment of damages was correct [*Oliver v. Morgan* (Mo.), 73 S.W.2d 993], it complains of the lack of evidence to have enabled the jury to make application of the measure of damages announced in the instruction, and insists not only that the burden was upon plaintiffs to have furnished proof affording a reasonable basis for the jury's finding, but also that such proof was of a character to have been capable of reasonable ascertainment.

> We do not believe that there is any merit to this contention. Obviously there could have been no accurate proof of what it would have cost to have supported plaintiffs' son until he would have reached his majority. In the very nature of things this element of the case was problematical, depending upon circumstances which no one could have foreseen with absolute certainty. Plaintiffs might indeed have attempted to estimate such cost, but for that matter, so could the jurors themselves, who are presumed to

> have been reasonable men, acquainted with the ordinary affairs of life, and doubtless as well informed as plaintiffs themselves regarding the expenses reasonably incident to the support of a boy of the age of the deceased. Furthermore it is to be borne in mind that though this feature of the case was one which was calculated only to reduce the damages, appellant nevertheless made no attempt to make any showing upon it . . . . .

 Ford does not contend that the court did not properly instruct the jury or that Ford itself could not have presented the information. We find no error at this point. See *Myers v. Cessna Aircraft Corp.*, 275 Or. 501, 525, 553 P.2d 355, 372 (assuming "evidence concerning effect of income taxes on projected earnings was relevant, we do not believe that, as a matter of law, plaintiff had an affirmative duty to produce such evidence through her own economist. . . . If [defendant] had wished to pursue the matter further, it could have called its own economist to testify.").

As to the amount of damages for lost services, companionship, and society, this court stated in *Pagitt v. City of Keokuk*, supra, at 703:

> Quite obviously it is impossible to generalize on the extent to which persons— including parents and children—enjoy each other's companionship and society. This is a highly personal relationship which must of necessity be decided on a case-by-case basis. When it relates to a parent and child, it depends on all the circumstances important in the lives of a *particular* parent and a *particular* child. It takes into consideration not only the character, age, intelligence, interests and personality of the child but also those same factors as they are possessed, or not possessed, by the parent. After all, it is the parent's loss which is being appraised, and the extent to which he has been deprived of the company of his minor child depends on the ability of the child to offer companionship and society and the ability of the parent to enjoy it.

A jury is in a better position than a court to take on the difficult task of placing a dollar amount of the loss of services, companionship, and society of a child. The verdict in this case, although large, does not shock the conscience or go beyond the bounds of the evidence. We are not willing to disturb the finding of the jury.

We find no error.

AFFIRMED.

All Justices concur except LeGRAND and MASON, JJ., who dissent.

UHLENHOPP, J., takes no part.

LeGRAND, Justice (dissenting).

I dissent from Division I and from the result because I believe the testimony of John Talbott, plaintiff's expert, should have been rejected.

Although plaintiff argues that this issue was not properly preserved, I find otherwise. It is true defendant raised no objection to the admission of Talbott's preliminary statements concerning his examination of the car and what he found therefrom. However, when he was asked to venture his ultimate opinion from these foundational facts, timely and adequate objection was made.

After reciting the familiar rules relating to the admission or rejection of expert testimony, the majority concludes Talbott's opinion was properly received, although "it reached the outer limits" of trial court discretion. I think it went one step beyond, and I would accordingly reverse.

I do not quarrel with Mr. Talbott's credentials as an expert, but it is not enough that a witness qualify as an expert. The facts in the particular case must furnish sound basis for the opinion he gives. There is no such basis in this case.

We are told by Mr. Talbott that eighteen months and 12,000 miles after this accident an examination of defendant's vehicle disclosed persuasive evidence of what had happened a year-and-a-half earlier. In no other setting would such a claim be given even passing credence. Yet the majority holds such "expert" opinion to be admissible. This record contains no reliable evidence to justify that conclusion. The circumstances upon which he relies are too remote when related to the time this accident occurred and to the condition of the car as it then was. His opinion is pure speculation and conjecture. Important legal rights should not be determined by such tenuous testimony. *See Hedges v. Conder*, 166 N.W.2d 844, 856–858 (Iowa 1969); *Tiemeyer v. McIntosh*, 176 N.W.2d 819, 824–826 (Iowa 1970).

I repeat what I said in my dissent in *Adams v. Deur*, 173 N.W.2d 100, 116 (Iowa 1969)—an expert should not be permitted to testify to unlikely and extravagant opinions simply because he claims he can do so.

MASON, J., joins this dissent.