**Marcus MILLS, Plaintiff,**

v.

**The State of IOWA; James Bryant; The Stolar Partnership, LLP; and Sally Mason, Bonnie Campbell, and Douglas True, in their official and individual capacities, Defendants.**

**No. 3:10–cv–112.**

United States District Court, S.D. Iowa, Davenport Division.

Feb. 19, 2013.

Megan R. Dimitt, Gregory M. Lederer, Lederer Weston Craig PLC, Cedar Rapids, IA, for Defendants.

Kelly R. Baier, Bradley & Riley, Cedar Rapids, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is a Motion for Summary Judgment, filed by The Stolar Partnership, LLP ("Stolar") and James Bryant ("Bryant") (collectively "Defendants"). Clerk's No. 71. Marcus Mills ("Mills" or "Plaintiff") filed a resistance to the Motion (Clerk's No. 94) and Defendants replied (Clerk's No. 101). The Court held a hearing on the Motion on August 3, 2012. Clerk's No. 103. Following the hearing, Magistrate Judge Walters authorized additional discovery (Clerk's No. 104), and the Court granted each party an opportunity to submit a supplemental brief. Clerk's No. 110. Plaintiff filed a supplemental brief on October 5, 2012. Clerk's No. 113. Defendant filed a supplemental brief on October 19, 2012.[1] The matter is fully submitted.

---

1. On October 26, 2012, Plaintiff filed a Reply to Defendants' supplemental briefing. Clerk's

## I. FACTUAL BACKGROUND

On July 26, 2005, then-University of Iowa ("University") president David Skorton ("Skorton") sent Plaintiff a letter offering him the position of "General Counsel" at the University commencing August 1, 2005. Pl.'s Statement of Add'l Material Facts (hereinafter "Pl.'s Facts") (Clerk's No. 94.2) ¶ 1; Skorton's July 26 Letter.[2] Among other things, Skorton's letter stated that the annual salary would be $190,000, and that:

> In accordance with long-standing University policy, this position is classified as "at will" status. The administrative, policy-making and other responsibilities of this position required this designation. This is consistent with other upper-level executives at the University. This designation means that you serve at the will of the institution and are not guaranteed a specific term of appointment.

Skorton's July 26 Letter. According to Mills, he and Skorton spoke about possible revisions to the July 26 letter because "Mills had concerns that he was giving up a position that had career status protec-

tions." Pl.'s Facts ¶ 2. Thus, on July 28, 2005, Skorton sent Mills a revised letter. Skorton's July 28 Letter.[3] Though the July 28 version of the letter was largely identical to the July 26 version, the July 28 letter raised the proposed salary to $197,000 per year and added the sentence, "It is my intention that you would serve for an initial term of not less than five years" after the "at-will" paragraph recited above. *Id.* Both letters included language indicating that the offer was "contingent on Board of Regents, State of Iowa approval and on successful completion of credential verification and of a criminal background check."[4] *Id.;* Skorton's July 26 Letter. On July 29, 2005, Mills accepted the General Counsel position offered in Skorton's letters and, upon fulfillment of the identified contingencies, became the Vice President for Legal Affairs and General Counsel of the University in August 2005. Pl.'s Facts ¶¶ 4–5.

On the morning of October 14, 2007, a female student athlete (the "Student Athlete") was sexually assaulted in her dormitory room on campus by two members of the University's football team.[5] *Id.* ¶ 6;

No. 123. The next day, Defendants filed a Motion to Strike the Reply, pointing out that the Court only authorized each party to file a single supplemental brief, and did not authorize any reply briefing. Clerk's No. 124. Plaintiff did not file a resistance to Defendants' Motion to Strike. Accordingly, the Motion to Strike is GRANTED, both because the Court did not authorize a reply brief (*see* Clerk's No. 110), and pursuant to Local Rule 7(f) ("If no timely resistance to a motion is filed, the motion may be granted without notice.").

2. Skorton's letter was provided to the Court in Plaintiff's Appendix filed in support of his resistance to a Motion for Summary Judgment filed by the State of Iowa, Sally Mason, Bonnie Campbell, and Douglas True. *See* Clerk's No. 66 at 47–48. For convenience, the Court will cite this document as "Skorton's July 26 Letter" throughout this Order.

3. Skorton's letter was provided to the Court in Plaintiff's Appendix filed in support of his

resistance to a Motion for Summary Judgment filed by the State of Iowa, Sally Mason, Bonnie Campbell, and Douglas True. *See* Clerk's No. 66 at 49–50. For convenience, the Court will cite this document as "Skorton's July 28 Letter" throughout this Order.

4. Mills characterizes both versions of the letter as either an offer of or as constituting "a written employment contract." Pl.'s Facts ¶ 1 ("On July 26, 2005, [Skorton] offered Marcus Mills a written employment contract."), ¶ 4 ("Mills signed the revised offer from [Skorton] on July 29, 2005. Mills' written employment contract providing that he would serve for an initial term of not less than five years was approved by the Iowa Board of Regents.").

5. When the Student Athlete first approached University personnel, she only alleged that a single University football player had assaulted her. Defs.' Statement of Undisputed Material Facts (Clerk's No. 71.1) ¶ 1. Upon investiga-

Defs.' Statement of Undisputed Material Facts (hereinafter "Defs.' Facts") (Clerk's No. 71.1) ¶¶ 1–2. The University of Iowa Athletics Department ("Athletics") initially received notice of the assault, along with Sally Mason ("Mason"), the University's President, Mills, and others. Pl.'s Facts ¶ 6. Athletics initially investigated the assault. *Id.* ¶ 7. In particular, Head Football Coach Kirk Ferentz and Athletic Director Gary Barta ("Barta") met with the Student Athlete and her father. *Id.* Barta communicated with Mason throughout Athletics' investigation. *Id.* On approximately October 23, 2007, Athletics delivered a report to Mills and Marcella David ("David"), the Director of the University's Office of Equal Opportunity and Diversity ("EOD"). Defs.' Facts ¶ 3; Pl.'s Response to Defs.' Statement of Undisputed Material Facts (hereinafter "Pl.'s Reply to Defs.' Facts") (Clerk's No. 94.1) ¶ 3; Defs.' App. (Clerk's Nos. 71.2–71.5) at 110. Thereafter, EOD commenced a formal investigation of the incident. Defs.' Facts ¶ 3; Pl.'s Reply to Defs.' Facts ¶ 3.

On October 24, 2007, at the request of Betsy Altmaier ("Altmaier"), the Faculty Athletic Representative to the Big Ten Conference and the NCAA, Mills spoke with the Student Athlete's father.[6] Pl.'s Facts ¶¶ 9–10. Between approximately October 24, 2007 and November 13, 2007, Mills had six separate phone calls with the Student Athlete's father.[7] *Id.* ¶ 10. None-theless, while EOD was completing its work, the Student Athlete and her family were becoming frustrated with a lack of communication and with harassment the Student Athlete was receiving in the dormitory. Defs.' Facts ¶ 6. On November 5, 2007, the Student Athlete filed a criminal report with University's Department of Public Safety ("DPS"). *Id.* ¶ 7. She thereafter reported the incident to the Johnson County Attorney, who eventually charged and prosecuted the two football players. *Id.*; Pl.'s Resp. to Defs.' Facts ¶ 7.

On November 16, 2007, Michael Gartner ("Gartner"), President of the Iowa Board of Regents (the "Board"), sent Mason an email informing her that Gartner was asking personnel from the Board's office to prepare it for "a look at the policies and processes involved in the alleged sexual assault at the University." Pl.'s Facts ¶ 11. Gartner requested that a timeline be prepared regarding the actions taken in response to the assault during the time period from October 14, 2007 to November 6, 2007. *Id.* Mason forwarded Gartner's email to Mills, Senior Vice President and Treasurer Douglas True ("True"), and Assistant Vice President and Director of Public Safety Charles Green ("Green"). *Id.* ¶ 12. Consistent with Gartner's request, Tom Evans ("Evans") and Tim Cook ("Cook"), the Board's General Counsel and Associate General Counsel respectively, initially spoke with Mills on November 19, 2007.[8] *Id.* ¶ 13.

---

tion of the incident by Department of Athletics personnel, it was discovered that a second football player had engaged in sexual intercourse with the Student Athlete without her knowledge. *Id.* ¶ 2. According to Mills, Brian Meyers, a Department of Public Safety officer, informed the Student Athlete of the actions of the second football player. *Id.*

6. Altmaier specifically asked Mills to contact the father of the Student Athlete to answer his questions regarding the University's policies and procedures. Pl.'s Facts ¶ 9.

7. Mills provides his recollection of the substance of calls with the Student Athlete's father on October 24 and 31, and on November 5, 7, 9, and 13, 2007 in his Statement of Additional Material Facts. *See* Pl.'s Facts ¶ 10.

8. According to Mills, Evans and Cook spoke to him about several written University policies, Resident Assistant training materials, and student orientation materials regarding sexual assault, and to gather the information requested by Gartner. Pl.'s Facts ¶ 13.

On November 21, 2007, a letter dated November 14, 2007 and signed by "the victim and her family" was faxed to Phillip Jones ("Jones"), the Director of Student Affairs, and Green. Defs.' Facts ¶ 9; Pl.'s Facts ¶ 18; Pl.'s Resp. to Defs.' Facts ¶ 9. Green faxed the letter to Director of University Relations Steve Parrott ("Parrott"), and also emailed Mason, True, Jones, and Mills about the letter, informing them that the mother of the Student Athlete was planning to send the letter to the Board and possibly the Governor.[9] Pl.'s Facts ¶ 19. A second letter by the Student Athlete's family that was highly critical of the University's handling of the incident, dated May 16, 2008 and addressed to Mason, Jones, and Mark Long, was received in the Office of the President on May 19, 2008. Pl.'s Resp. to Defs.' Facts ¶ 9.

In his contacts with Evans related to the Board's review, Mills informed Evans of a November 14, 2007 Order of the Iowa District Court for Johnson County prohibiting the release of information regarding the incident.[10] Pl.'s Facts ¶ 14. Mills did not provide any documents to Evans; he did, however, orally recount the events that had occurred up to that point in time. *Id.* ¶ 16; Defs. Reply to Pl.'s Statement of Add'l Material Facts ("Defs.' Reply to Pl.'s Facts") (Clerk's No. 101.2) ¶ 16.

On June 11, 2008, Evans issued a report to the Board which concluded that the University had "fully complied" with internal procedural requirements, had offered the Student Athlete appropriate accommodation, and had expressed full support for the Student Athlete.[11] Defs.' Facts ¶ 11; Pl.'s Facts ¶ 21. It is undisputed that neither Mills nor anyone else at the University ever turned the two letters from the Student Athlete's family over to Evans or the Board.[12] Defs.' Facts ¶ 10. Thus, Evans neither referenced nor considered the letters in providing his report to the Board.

On July 19 and 21, 2008, the two letters from the Student Athlete's family became public. *Id.* ¶ 12; Pl.'s Facts ¶ 22. On July 22, 2008, the Board, in a special meeting, established an Advisory Committee composed of three Board members to "reopen the investigation of the University of Iowa's handling of the alleged sexual assault on a female student on the morning of October 14, 2007." Defs.' Facts ¶ 13. The Board tasked the Advisory Committee with completing its work and preparing a report for the Board by September 18, 2008, and explicitly authorized the Advisory Committee to "hire outside counsel as needed to assist in their investigation of the facts." *Id.* ¶ 14. On July 28, 2008, the Advisory Committee hired Stolar as "Special Counsel" to represent it and the Board

---

**9.** On November 26, 2007, Green informed Mills that he had spoken to the Student Athlete's father and that the family had decided not to send the letter to either the Board or the Governor. Pl.'s Facts ¶ 20.

**10.** Mills asserts that he "interpreted" this order as precluding the release of information about the Student Athlete's alleged sexual assault "not only to third parties but also within the University itself." Pl.'s Facts ¶ 14. Mills further claims that he consulted David and the Iowa Attorney General's office, "both of whom interpreted the Order in the same way as did Mills." *Id.* ¶ 15.

**11.** In preparing his report, Evans did not speak with Mason, the Student Athlete, or her parents. Pl.'s Facts ¶ 21.

**12.** Mills contends that he did not turn over the letters from the Student Athlete's family because they did not relate to Gartner's requests for a review of the "policies of the University or the timeline of the incident." Pl.'s Resp. to Defs.' Facts ¶ 10. Mills further asserts that Evans never requested the letters and that Mills was not permitted to turn them over to Evans in any event because of the attorney-client privilege. *Id.*

and "to conduct an investigation of the responses and actions of the University of Iowa, its administration, departments and personnel" regarding the incident.[13] *Id.* ¶ 15; Pl.'s Facts ¶ 23. In accepting the position as Special Counsel, Stolar considered that the Advisory Committee had retained it to provide legal services and representation, that the Advisory Committee and the Board were clients of the Stolar law firm, and that any report issued was for the benefit of the Advisory Committee and the Board, to be used as they saw fit in discharging their duties to the public.[14] Defs.' Facts ¶ 25.

In conducting its investigation,[15] Stolar reviewed the Student Athlete's allegations and the letters written by her family; conducted over forty personal interviews with various people including the Student Athlete, her family, University students, officials, and personnel, and experts in sexual violence victims' advocacy and rights; analyzed the reasons relevant documents were not provided to the Board during its review of the incident; reviewed all applicable University policies and procedures in conjunction with state and federal laws and regulations; evaluated the impact of relevant laws and court orders on the University's response to the incident; and reviewed past investigations and recommen-

dations of sexually related complaints and incidents at the University. Defs.' Facts ¶¶ 16, 19–20. On September 18, 2008, Stolar issued a report (the "Stolar Report") to the Board and the Advisory Committee detailing its findings.[16] *Id.* ¶ 17; Pl.'s Facts ¶ 23.

The Stolar Report contained: 1) an assessment of whether the University's relevant policies and procedures were followed; 2) an identification of problems and concerns with existing policies and procedures; and 3) preliminary recommendations of changes to policies and procedures. Defs.' Facts ¶ 17. Among other things, Stolar concluded that Mills' responses to the incident were "consistent with a culture of a lack of transparency at the University General Counsel's Office and likely contributed to allegations of a University cover-up"; that Mills contacted the Student Athlete's father "out of the blue" and told him that Mills was a "liaison for the University" and that he would "be the Student Athlete's family's contact for information on the investigation"; and that Mills' involvement in "micromanaging the University's response to the incident presented a serious conflict of interest." [17] Pl.'s Facts ¶ 24; Defs.' Facts ¶ 32. According to Stolar, all statements in the Stolar Report were made "in good faith in

---

13. Stolar made initial arrangements to meet with the Advisory Committee on July 26, 2008. Defs.' Facts ¶ 23. It was on that date that the three principal lawyers for Stolar first heard about the October 14, 2007 incident. *Id.* ¶ 24. Prior to that time, none of the lawyers knew Mills, Mason, the Student Athlete, or any of the other people that were ultimately interviewed over the course of the next several weeks. *Id.* The Stolar lawyers also were unaware of anything that had occurred at the University as a result of the incident. *Id.*

14. Mills asserts, however, that the Board always intended that Stolar's report would be made public. Pl.'s Resp. to Defs.' Facts ¶ 25.

15. Various Stolar personnel were involved in preparing the Stolar Report, however, it appears that Bryant was the "lead" investigator, report writer, and spokeperson for Stolar in the events that are the subject of this Order.

16. Mills points out that the Stolar Report was disclosed to the Board in a public meeting. Pl.'s Resp. to Defs.' Facts ¶ 25.

17. Mills contends that the findings of the Stolar Report, as they pertained to him, were false. Pl.'s Facts ¶ 24. He further points out that both Mason and Altmaier have either stated or testified about their disagreement with many of the findings of the Stolar Report as it pertained to Mills. Pl.'s Facts ¶¶ 25–30.

discharging Stolar's duty to the Advisory Committee and the Board of Regents, who retained Stolar to conduct the investigation and issue its report." Defs.' Facts ¶ 26. Stolar further contends that it was not aware of any errors or mistakes in the report at the time it was issued, that Stolar did not intend or have a purpose to harm or damage Mills or anyone else in its investigation, and that in preparing the Stolar Report, it "believed the statements in the report were accurate and the conclusions in the report were substantiated by what Stolar learned in the course of its investigation."[18] Id. ¶¶ 27–29.

The Stolar Report did not contain any recommendations regarding the continued employment of Mills or any other University of Iowa personnel.[19] Defs.' Facts ¶¶ 18, 30. Nonetheless, on September 19, 2008, Mason informed Mills that she was going to remove him from his position as Vice President for Legal Affairs and General Counsel.[20] Pl.'s Facts ¶ 31. On September 21, 2008, True informed Mills that if he resigned as General Counsel, there was no assurance that he could continue employment with the University in any capacity. Id. ¶ 32. In light of True's statement, Mills told Mason on September 22, 2008 that he was unwilling to resign and would provide her with his response to the Stolar Report the following day. Id. ¶ 33. Late in the morning on September 23, 2008, Mills provided Mason with his response to the Stolar Report, which included a request to correct what Mills perceived as flaws therein. Id. ¶ 34. Though Mason had already signed a letter terminating Mills' employment with the University, she testified at deposition that she "held off sending it" so that she could review Mills' response. Pl.'s App. (Clerk's No. 94.5) at 6 (Mason Dep. 89:6–25) (testifying that she had left a signed copy of the termination letter with her staff and had given directions that it "needed to be delivered if and when I called"). Mason reviewed Mills' response to the Stolar Report, but ultimately ordered that the termination letter be delivered to Mills, to be effective immediately.[21] Pl.'s Facts ¶ 35. Though Mills has subsequently applied for several employment positions with the University, True informed him in a letter dated November 23, 2009 that he would not be considered for any position with the University. Id. ¶¶ 45–46.

In the months following Mills' termination, various articles were published in the Iowa City Press Citizen and the Des Moines Register regarding the matter.

---

**18.** Mills denies Stolar's allegation about the good faith and accuracy of its report, arguing that the Stolar Report contains "fundamental inaccuracies" in its findings about him and that the "Stolar Partnership determined to make Marc Mills a scapegoat." Pl.'s Resp. to Defs.' Facts ¶¶ 26–29 ("The report is reckless in its inaccurate and unfounded allegations against Marc Mills.").

**19.** It is undisputed that neither the Board nor the Advisory Committee asked Stolar to opine or make recommendations regarding the continued employment of University personnel. Defs.' Facts ¶ 18.

**20.** Mason testified that she began considering terminating Mills after the release of the Stolar Report. Pl.'s Facts ¶ 56. According to Mills, Mason "gave him a hug and told him that she had never had to fire someone who had done nothing wrong" and "stated that Mills would have another job within the University." Id. ¶ 31. Stolar denies this allegation, citing Mason's deposition testimony that she told Mills that she "hoped" he could be given alternate employment with the University. Defs.' Resp. to Pl.'s Facts ¶ 31; see Pl.'s App. (Clerk's No. 94.5) at 5 (Mason Dep. 81:19–25).

**21.** Mills alleges that he was not provided an opportunity for a pre-termination hearing, and that subsequent to his termination, he has requested, but has not been provided with, any form of post-termination name clearing hearing. Pl.'s Facts ¶¶ 35–36.

*Id.* ¶¶ 37, 39, 41. On December 27, 2008, the Press Citizen ran an article entitled, "Bryant, Former UI official viewed sexual assault investigation as political," which contained the following information:

> However, among new information was Bryant's note on a printout of Mills' bio that said "viewed inv. as political." Bryant made the observation based on Mills' comments during introductions prior to the interview, Bryant said on Tuesday.
>
> "He was just kind of like, 'We all know this is politics and what this is all about, but I am willing to cooperate.'" Bryant said. "He didn't use those exact words, although he referred to 'politics' a few times. I don't want to say he said you are just going through the motions, but that's what came through. I will do what I need to do to make it go away."

"Maybe that is not what he meant," Bryant said. "It just surprised me, that's all." Defs.' Facts ¶ 33. A substantially similar article appeared in the Des Moines Register on December 29, 2008. *Id.* ¶ 34.

## II. STANDARD OF REVIEW

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[22] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[23] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7

---

**22.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**23.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

Mills' Amended Complaint asserts the following counts against Stolar and Bryant: 1) Count III for false light invasion of privacy and defamation; 2) Count VI for violation of due process; and 3) Count VII for interference with contract.[24]

---

**24.** Mills Complaint also asserted several claims against the State of Iowa, Mason, Campbell, and True. *See generally* Am. Compl. (Clerk's No. 35). Summary Judgment in favor of these defendants was granted in an Order dated October 3, 2012, 895 F.Supp.2d 944 (S.D.Iowa 2012). Clerk's No. 111.

*See generally* Am. Compl. (Clerk's No. 35). As a preliminary matter, the Court finds summary judgment in favor of Defendants appropriate on Count VI because it appears that Plaintiff has abandoned this claim as against Stolar and Bryant.[25] Accordingly, the Court turns to an evaluation of Counts III and VII.

### A. Defamation (Count III)

■ Under Iowa law, defamation consists of the twin torts of libel and slander. *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) (citing *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 83 (Iowa 2001)). More specifically: "Libel in Iowa is the 'malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business.'" *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1984) (quoting *Plendl v. Beuttler*, 253 Iowa 259, 111 N.W.2d 669, 670–71 (1961)). Slander's definition is nearly identical to that of libel, however, the injurious words are conveyed by oral statements. *Id.*

■ To state a claim for defamation, Plaintiff must establish the following prima facie elements: 1) Defendants made a statement about Plaintiff; 2) the statement was false; 3) the statement was made with malice; 4) the statement was communicated to somebody other than Plaintiff, 5) the statement tended to injure the reputation of Plaintiff, expose Plaintiff to public hatred, contempt or ridicule, or injured Plaintiff in his efforts to maintain his business; 6) the Summary judgment in favor of Defendants is warranted in light of Plaintiff's non-resistance. *See* L.R. 56(b)(1) (requiring a party resisting a motion for summary judgment to file a brief "in which the resisting party responds to each of the grounds asserted in the motion for summary judgment"). statement caused damage to Plaintiff; and 7) the amount of damage. *See* Iowa Civil Jury Ins. 2100.3; *see also Vinson*, 360 N.W.2d at 115 ("In actions based on language not libelous per se, all of these elements must be proved ... before recovery can be had." (citations omitted)).

---

**25.** In Count VI of the Amended Complaint, Mills asserted that Stolar and Bryant violated his due process rights when they made stigmatizing false allegations against him "that attacked his good name, reputation, honor and integrity and which resulted in his discharge from employment." Am. Compl. ¶ 68. Mills pointed out that he "requested a name-clearing hearing and Mason denied Mills the right to a name-clearing hearing." *Id.* ¶ 71.

Defendants argued that summary judgment in their favor on Count VI was proper because "Stolar did not have the power to grant Plaintiff a name clearing hearing." Defs.' Br. (Clerk's No. 74) at 32. In particular, Defendants pointed to the following testimony from Mills' deposition:

Q. And would you agree that [Stolar and Bryant] don't have the power to hold a name-clearing hearing?

A. Not in terms of legal power, yes. I think they have the power in terms of their prior work and influence with the University, but not—they don't have the legal power in that respect.

*Id.* at 33 (citing Defs.' App. 93 (Mills Dep. 21:14–19)).

In resisting Defendants' Motion for Summary Judgment, Mills neither referenced Count VI nor made any response to Defendants' arguments. *See generally* Pl.'s Br. (Clerk's No. 96) Moreover, at the Court's August 3, 2012 hearing, Plaintiff neither commented upon nor refuted the following comments by Defendants' counsel: "We filed a motion for summary judgment that included an attack on the Stolar and Bryant component of Count VI. . . . I do not believe that Mills resisted that portion of our motion for summary judgment. . . . And so I don't believe that there's a legitimate issue with respect to count VI and my clients." Hr'g Tr. at 55.

■■■ If Plaintiff can demonstrate to the Court that Defendants' statements are defamatory per se, however, Plaintiff may proceed "without proof of malice, falsity or damage." *Vinson*, 360 N.W.2d at 115 (citing *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968)). The Iowa Supreme Court long ago identified what type of statement is considered defamatory per se:

> The defamatory words ... must be of such a nature that the court can presume as matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize. In many cases, moreover, words charging plaintiff with the commission of acts permissible in law, although they may lack public approval, have been held not to expose plaintiff to hatred, contempt, ridicule, or disgrace in the sense or to the degree required by the law of [defamation], as, for instance, charging one with setting up the statute of limitations, or the illegality of a contract, as a defense.

> To accuse one of being deficient in some quality which the law does not require him as a good citizen to possess is not [defamatory] per se. Mere general abuse and scurrility, however ill natured and vexatious, is no more actionable when written than when spoken, if it does not convey a degrading charge or imputation.

*Fey v. King*, 194 Iowa 835, 190 N.W. 519, 521 (Iowa 1922) (citations omitted). Thus, defamatory statements are those that "tend[ ] to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business." *Vinson*, 360 N.W.2d at 115; *see also Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998) (noting that defamation is based on the "public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks" and characterizing statements as defamatory per se when they have "a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." (citing 50 Am. Jur.2d, *Libel & Slander*, § 2, at 338–39 (1995))). Taken a step further, a statement is defamatory per se if the words "are of such a nature, whether true or not, that it can be presumed as a matter of law that their publication or conveyance will have a libelous or slanderous effect." *Vinson*, 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.*, 252 Iowa 517, 107 N.W.2d 444, 447 (1961)). For example, "[a]n attack on the integrity and moral character of a party is [slanderous] per se." *Id.* (citing *Shaw Cleaners & Dyers v. Des Moines Dress Club*, 215 Iowa 1130, 245 N.W. 231, 234 (1932)).

### 1. *Stolar.*

Plaintiff relies on the following statements from the Stolar Report as the foundation for his defamation claim against Stolar: 1) "Mills' responses to the incident were consistent with a culture of a lack of transparency at the University General Counsel's Office and likely contributed to the allegations of a University cover-up" ("Statement A"); 2) "Mills' involvement in micromanaging the University's response to the incident presented a serious conflict of interest" ("Statement B"); 3) "On or about October 24, according to the Student Athlete's father, Mills contacted him 'out of the blue' and told him that he was a 'liaison for the University'" ("Statement C"); and 4) "Mills told the Student Athlete's father that from that point on, Mills would be the Student Athlete's family's contact for information on the investigation" ("Statement D"). *See* Pl.'s Br.

(Clerk's No. 96) at 11–12; Defs.' Facts ¶ 32; Defs.' App. at 167–68.

### a. *Statements C and D.*[26]

■ Read in context, with the allegedly defamatory material italicized, the Stolar Report provides:

> Mills' failed communication with the Student Athlete's father was also detrimental to the University's relationship with the Student Athlete and her family. *On or about October 24, according to the Student Athlete's father, Mills contacted him "out of the blue" and told him that he was a "liaison for the University."* [footnote citing "Investigators' interview with Student Athlete's father"]. Mills' notes show he first contacted the Student Athlete's father at Betsy Altmaier's suggestion and remained in contact through November 13. *Mills told the Student Athlete's father that from that point on, Mills would be the Student Athlete's family's contact for information on the investigation.* [footnote citing to *id.*]. The Student Athlete's father was deeply dissatisfied with Mills' performance as an informant on the progress of the investigation.

Defs.' App. at 168.

Mills argues that these Statements C and D satisfy the second (falsity) and third (malice) elements of a prima facie case because: 1) "Mills has testified that the statements are false"; 2) Plaintiff's expert, Mark McCormick ("McCormick"), stated in his expert report that neither Stolar nor Bryant asked Mills about his conversations with the father, the Stolar Report does not refer to Mills' notes or their contents, and the Stolar Report "only credits conclusory

assertions attributed to [the father]." Pl.'s Br. at 13. Thus, Mills concludes: "[t]he reckless and unfounded allegations against Mills by Stolar at a minimum raise a genuine issue of fact regarding whether [these statements] were made with malice."[27]

Neither of the italicized statements are actionable as defamation because neither statement expresses an opinion or conclusion *of Stolar.* Rather, it is plainly apparent that both statements merely recount comments made by the Student Athlete's father to the Stolar investigators. Indeed, both statements cite to the "Investigators' interview with the Student Athlete's father" as the source of the information, and the first statement additionally contains an in-text notation attributing the "out of the blue" and "liaison" comments to "the Student Athlete's father." *Id.* While Mills states in affidavits that the "Stolar Report state[ments are] false," his quibble is with the father's recollection of events versus his own—not with the Stolar Report's recounting of the father's statements. *See* Pl.'s App. at 5 (Mills Aff.), ¶ 22 ("The Stolar Report stated that I contacted the Student Athlete's father 'out of the blue' and told him that I was a 'liaison for the University.' This statement is false."), ¶ 24 ("The Stolar report stated that I contacted the student athlete's father and told him that 'Mills would be the Student Athlete's family's contact for information on the investigation.' This statement is false."). While both Mills and his expert clearly believe that Mills neither contacted the Student Athlete's family "out of blue" nor told them that he would be their "liaison" or "contact for information," neither contends that the father did not report such things to Stolar or that Stolar falsely

---

**26.** For ease of reading, the Court will address Statements C and D before addressing Statements A and B.

**27.** Despite characterizing his argument as addressing both the falsity and malice elements,

Mills does not reference the falsity element as to Statements C and D in his analysis beyond pointing to his own attestation that they are false.

relayed or otherwise misrepresented the father's comments in the paragraph from the Stolar Report cited above.[28] In short, even if Mills could prove that the Student Athlete's father was lying about the things Mills said, this would still be insufficient to prove that *Defendants* made any *false* statements since the Stolar Report merely recounted the father's comments.

### b. *Statements A & B.*

■ Mills urges that Statement A in the Stolar Report, i.e., that "Mills' responses to the incident were consistent with a culture of a lack of transparency at the University General Counsel's Office and likely contributed to the allegations of a University cover-up," is false and was made with malice. In support of the falsity of Statement A, Mills points out that Mills, Mason, and Altmaier have all "testified that there was not a 'culture of a lack of transparency at the University General Counsel's office.'" Pl.'s Br. at 12. In support of malice regarding Statement A, Mills points to McCormick's expert report which states that the Stolar report is "reckless in its inaccurate and unfounded allegations against Marc Mills. The trier of fact could conclude that the Stolar Partnership determined to make Marc Mills a scapegoat." *Id.*

Mills argues that Statement B in the Stolar Report, i.e., that "Marcus Mills' involvement in micromanaging the University's response to the incident presented a serious conflict of interest," satisfies the second and third elements of a prima facie case. Pl.'s Br. at 13. Mills points to McCormick's expert report which states that "Marc Mills complied fully with the standard in Rule 32:4.3 of the Iowa Rules

of Professional Conduct in his communications with [the father]," and that "[n]o evidentiary or legal support exists for the Stolar report's assertion that Marc Mills had a conflict of interest in responding to [the father's] inquiries." *Id.* According to Mills, McCormick's testimony establishes a "genuine issue of fact[ ] . . . regarding whether the statement is false and whether it was made with malice." *Id.*

■ The mere fact that Plaintiff, his expert, or anyone else disagrees with the conclusions of the Stolar Report does not generate a genuine issue of material fact on the falsity of either Statement A or Statement B. Indeed, the disagreement highlights the fact that these statements are expressions of opinion that are not subject to an action for defamation. "Opinion is absolutely protected under the first amendment." *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989). Sometimes, however, a statement couched as an opinion may contain or imply sufficient factual content, that if untrue, could still support a defamation action. *See Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 768–71 (Iowa 2006) (" '[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false.' " (quoting *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C.Cir. 1994))). Thus, in determining whether any particular statement of seeming opinion is actionable, the Court must determine "whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts are capable of being proven true or false." *Id.* at 771. The analysis must

---

**28.** McCormick states in his expert report that, "[n]o substantial evidence exists in the materials that I reviewed that would support the allegations in the Stolar report that Marc Mills directed the investigation, was directed to act as a liaison between the university

president and the victim or her family . . . or that Mills breached any duties under university policies." Pl.'s App. at 63. McCormick does not, however, appear to have spoken with the Student Athlete's family in preparing his report.

evaluate the totality of the circumstances, which requires consideration of the following factors: 1) the precision and specificity of the disputed statement; 2) the degree to which the statement is objectively capable of being proved or disproved; 3) the literary context in which the statement is made; and 4) the broader social context into which the statement fits. *Id.* at 769–70; *see also* Rodney A. Smolla, *Law of Defamation* § 6:45 (2d ed. 2012) ("Courts sometimes simply define opinions as statements that cannot be proved or disproved; other courts list a variety of factors but appear to employ verifiability as the controlling element ... only if the statement suggests specific factual assertions that could be proven true or false could the statement qualify as actionable defamation. The more fact-based the statement, the greater likelihood that it will be actionable. Conversely, where the statement consists of loose, figurative or hyperbolic language, it will be more likely to be deemed nonactionable as rhetorical hyperbole or a vigorous epithet ... with regard to context, courts must consider the listener's reasonable interpretation, which will be based in part on the context in which the statement appears." (quotations and citations omitted)).

■ Statements A and B do not have precise or specific meanings, are not in themselves objectively capable of being proved or disproved, and do not imply facts that are objectively capable of being proved or disproved. Even if the Court were to permit every single individual involved in any way with the University and the assault investigation to testify at a trial in this case, it would be entirely reasonable for some jurors to believe, and for some to disbelieve, that there was a "culture of a lack of transparency" in the General Counsel's office, that Mills' actions were consistent with that culture, that Mills "micromanaged" the University's response, and that such response constituted a "serious conflict of interest." Given this fact, the Court does not believe that a reader of the Stolar Report could reasonably believe that Statements A and B are anything more than Stolar's First Amendment protected opinions.[29] As such, the statements are not actionable.

---

29. Mills additionally argues in his Brief that all of the identified statements from the Stolar Report are defamation per se because they are "incompatible with Mills['] employment as an attorney, and particularly as a General Counsel for an institute of higher education." Pl.'s Br. at 14 (citing *Kent v. State of Iowa,* 651 F.Supp.2d 910, 964–65 (S.D.Iowa 2009)). According to Mills:

> The allegations that he created a culture of a lack of transparency at the General Counsel's Office that led to allegations of a cover up and that he engaged in a conflict of interest when he spoke to the father, were so damning that Mills has been unable to obtain employment of any kind at the University of Iowa.

Pl.'s Br. at 14.

The Restatement (Second) of Torts provides that statements are defamatory per se when they impute to another "a matter incompatible with an individual's business, trade, profession, or office, as stated in § 573." *See* Restatement (Second) of Torts § 570 (1977). Section 573 provides: "One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office ... is subject to liability without proof of special harm." The comments to § 573 state that the "imputation must be of such a character as to disparage the other in the pursuit of his business ... or tend to harm him in it." Restatement (Second) of Torts § 573 cmt. c. Moreover, a statement imputing a single mistake or act of misconduct is actionable "only if the act fairly implies an habitual course of similar conduct, or the want of the qualities or skill that the public is reasonable entitled to expect of persons engaged in such a calling." *Id.* cmt. d. Thus, "a statement that a lawyer has erred in the handling of a particular case does not necessarily imply that he is unlearned or

### 2. *Bryant.*

■ In support of his defamation claim against Bryant, Mills relies on Bryant's comments to the media, which were printed in both the Iowa City Press Citizen and the Des Moines Register. Pl.'s Br. at 14–15. In particular, Bryant is quoted by both media outlets as having explained his note that Mills "viewed inv. as political" as follows: "He was just kind of like, 'We all know this is politics and what this is all about, but I am willing to cooperate'.... He didn't use those exact words, although he referred to 'politics' a few times. I don't want to say he said you are just going through the motions, but that's what came through. I will do what I need to do to make it go away.... Maybe that is not what he meant.... It just surprised me, that's all." *Id.*; Defs.' Facts ¶¶ 33–34; Defs.' App. at 368–71.

■ In support of his claim that Bryant's comments were defamatory, Mills points to his own testimony that Bryant's

statements are false and Bryant's acknowledgment within the statement that it did not reflect Mills' "exact" words, arguing that "Bryant clearly went beyond the facts known to him when he gave a newspaper reporter an inaccurate version of what Mills said to him." Pl.'s Br. at 16. As with the Stolar Report statements, however, the Court finds the statements insufficient to be actionable defamation. The entire context and tenor of Bryant's statement clearly indicates that he was relaying his own subjective impressions of his conversation with Mills. There is nothing in the statement that implies that Bryant knows additional facts that would support his opinion, and there is no content in the statement that is objectively capable of being proved true or false.[30, 31]

### B. *False Light Invasion of Privacy (Count III)*

Mills alleges in Count III that the same statements supporting his claim for defa-

incapable of adequately protecting his clients." *Id.*

None of the four statements from the Stolar Report rise to the level of defamation per se under § 573. As discussed *supra*, Statements C and D do not even purport to be statements of Stolar. Statement B cannot be read as fairly implying an habitual course of conduct; rather, at best, it can be read as implying that Mills' handling of *this* particular case was improper, placing it squarely within § 573, comment d's exclusion. Statement A also does not qualify because nothing about a "culture of a lack of transparency" is inherently or necessarily incompatible with Plaintiff's role as General Counsel.

30. Although the parties give the matter only passing attention, the Court notes that the record regarding Bryant's statement does not appear to contain any evidence supporting the sixth element of a prima facie defamation case—causation. While Plaintiff repeatedly points to record evidence that Mason fired him and the University declined to rehire him because of the Stolar Report, there is no indication that Bryant's statements to the me-

dia were either seen or relied upon by anyone in determining whether he should maintain or obtain employment. In fact, with reference to Mills' termination, it is clear that Mills was terminated from the University *before* Bryant made any statements to the media.

31. Mills further contends that Bryant's statements are defamatory per se because they are incompatible with his role as General Counsel, arguing that Bryant's statements "implied that Mills trivialized the investigation and did not take it seriously." Pl.'s Br. at 16. Defamation by implication, however, "arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a serious of facts so as to imply a defamatory connection between them; or (2) creates a defamatory implication by omitting facts." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). Here, Plaintiff has offered no evidence that Bryant omitted or juxtaposed any facts in his statements to the media.

mation, i.e., Statements A–D in the Stolar Report and Bryant's statements to the media, support a claim for false light invasion of privacy. To maintain this cause of action under Iowa law, Mills must demonstrate that: 1) Defendants gave publicity to a matter concerning Mills that placed him before the public in a false light; 2) the false light Mills was placed in would be highly offensive to a reasonable person; and 3) Defendants had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Mills was placed. *See Kiesau,* 686 N.W.2d at 179; *see also Willson v. City of Des Moines,* 386 N.W.2d 76, 83 n. 8 (Iowa 1986) ("We have long recognized this common law tort and have adopted the elements of false light invasion of privacy as set forth in the Restatement (Second) of Torts § 652E (1977). A claim for false light invasion of privacy is based upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person.").

■ Defendants primarily argue that Mills cannot establish that Defendants "knew or entertained serious doubts as to the veracity of the Stolar Report or Bryant's statements. There is no evidence that Stolar intended to produce a false report [or that] Stolar made statements or expressed opinions in the Stolar Report that it knew or suspected were false, let alone over which Stolar 'entertained serious doubts.' "[32] Defs.' Br. (Clerk's No. 74) at 32. The Court agrees. Plaintiff has not pointed to a single citation in the record that would support a conclusion that Defendants, at the time of their statements, harbored any doubts whatsoever as to the veracity of the information in the Stolar Report or in Bryant's comments to the media. While Plaintiff cites McCormick's expert opinion that the Stolar investigation was "reckless in its inaccurate and unfounded allegations against Marc Mills," *see* Pl.'s Br. at 23, the fact that McCormick ultimately reached different conclusions about the propriety of Mills' conduct in relation to the investigation than did Stolar does nothing to generate a genuine issue of material fact about whether *Defendants* actually knew or had reason to know that their own statements and conclusions were false.[33]

---

**32.** Defendants also argue that they did not give publicity to a matter concerning Mills. Defs.' Br. at 32. According to Defendants, "in the discharge of their duties, [they] conducted interviews and produced a report for its client, the Board of Regents." *Id.* Plaintiff counters that "Stolar presented its Report at a public meeting of the Board of Regents and made further public statements about the Report." Pl.'s Br. at 22. Plaintiff cites to the Board's September 17–18, 2008 agenda, which contains a transcript of extensive comments by Defendants about the Stolar Report during the meeting. *Id.* (citing Defs.' App. at 316). Although the decision to have Defendants speak about the Stolar Report at the meeting may have been made by the Board, the fact remains that Defendants *did* publicly speak about their findings. Accordingly, the Court will find for purposes of the false light

claim only that there is at least a genuine issue of material fact on the publication component.

**33.** Plaintiff's failure to generate a genuine issue of material fact on the falsity of the Defendants' statements as to his defamation claim is also fatal to his claim for false light invasion of privacy. *See Anderson v. Low Rent Housing Comm'n of Muscatine,* 304 N.W.2d 239, 248 (Iowa 1981) (holding that, just as in a defamation claim, a false light invasion of privacy plaintiff must demonstrate that a defendant caused "untruthful" statements to be published). The Court is also extremely dubious that Plaintiff has generated a genuine issue of material fact as to whether a reasonable person would find Defendants' statements "highly offensive."

C. *Applicability of Qualified Privilege to Defamation and False Light Invasion of Privacy Claims in Count III*

 Defendants argue that even if Plaintiff has asserted viable claims for defamation or false light invasion of privacy, they are entitled to summary judgment on the basis of qualified privilege. "Qualified privilege is an affirmative defense which must be pleaded and proved." *Vinson*, 360 N.W.2d at 116. Defendants properly raised qualified privilege as an affirmative defense to Plaintiffs' Complaint in their Answer. *See* Clerk's No. 40 at 20. Iowa law regarding privileged communications provides:

> Sometimes one is justified in communicating to others, without liability, defamatory information.... The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.

*Vojak*, 161 N.W.2d at 105.

 A qualified privilege may be found to exist with respect to otherwise defamatory statements if: 1) the statement was made in good faith; 2) the defendant had an interest to uphold; 3) the scope of the statement was limited to the identified interest; and 4) the statement was published on a proper occasion, in a proper manner, and to proper parties only. *Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004) (quoting *Winckel v. Von Maur, Inc.*, 652 N.W.2d 453, 458 (Iowa 2002)). The question of whether the privilege is available in a particular case is ordinarily one for the Court to determine, rather than a jury. *Vinson*, 360 N.W.2d at 116.

Plaintiff argues Defendants have failed to demonstrate their entitlement to a qualified privilege because he has provided "substantial evidence" that Defendants statements were not made in good faith, were made outside the scope of any interest Defendants had to uphold, and were not appropriately limited in their publication. Pl.'s Br. at 2, 16–17. Plaintiff further argues that even if Defendants are protected by the qualified privilege, they have abused the privilege by acting with malice, by publishing the statements excessively, and by publishing the statements to persons who did not have a legitimate interest. *Id.* at 18. The Court will address each argument in turn.

1. *Good faith.*

Plaintiff contends that Defendants' statements were not made in good faith "because they were made with reckless disregard for their truth or falsity." Pl.'s Br. at 17. According to Plaintiff, "[s]ubstantial evidence of Stolar and Bryant's reckless disregard for the truth and falsity of their statements is contained in the Expert Report of Mark McCormick." *Id.* In particular, Plaintiff points to: 1) McCormick's assertion that there is no support for the Stolar Report's conclusion that Mills acted under a conflict of interest; 2) McCormick's criticism of Bryant for not asking Mills about his conversations with the Student Athlete's father; and 3) McCormick's criticism of the Stolar Report for not referring to Mills' notes and "only credit[ing] conclusory assertions attributed to [the father]." *Id.* According to Mills, the "reckless and unfounded allegations against Mills by Stolar at a minimum raise a genuine issue of fact regarding whether Stolar and Bryant's statements were made in good faith, and the issue should be decided by the jury." *Id.*

 The Court disagrees with Plaintiff and finds that Defendants' state-

ments were made in good faith. Plaintiff cites *Bitner v. Ottumwa Community School District* for the proposition that a "reckless disregard for truth or falsity may be established 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Id.* (quoting 549 N.W.2d 295, 300 (Iowa 1996)). As Plaintiff acknowledges, the quoted language from *Bitner* relies on the Supreme Court's opinion in *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In *St. Amant*, however, the Court emphasized that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that *the defendant in fact entertained serious doubts as to the truth of his publication.*" 390 U.S. at 731, 88 S.Ct. 1323 (emphasis added). As the Court states numerous times throughout this Order, McCormick's after-the-fact opinion that the Stolar Report's conclusions about Mills are unfounded simply does not establish that Defendants "in fact entertained serious doubts" as to the truth of any of their statements.[34]

### 2. *Defendants' interest.*

■ Defendants contend that the Advisory Committee and Board retained Stolar to represent them, to conduct an independent investigation into the handling of the incident involving the Student Athlete, and to report to them the findings of that independent investigation. The Board and Advisory Committee's obligations to the public and Defendants' interest in comply-

ing with the Board and Advisory Committee's charge are sufficient to sustain a qualified privilege. *See* Restatement (Second) of Torts § 598 (1977) ("An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important public interest, and (b) the public interest requires the communication of defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true."); *see* Pl.'s Br. at 17–18 ("Mills will accept Stolar's stated interest for purposes of the motion for summary Judgment."); Pl.'s Supp. Br. at 8 ("For purposes of qualified privilege, the interest to uphold was conducting an investigation to provide the public the truth and a complete understanding of the events following the sexual assault." (capitalization modified from original)).

Plaintiff makes no argument whatsoever in his initial brief regarding whether Stolar exceeded the bounds of its interest, contending only that "Bryant's inaccurate statement implying that Mills believed the investigations [sic] was 'politics' clearly was outside the scope of [Defendants'] interest." Pl.'s Br. at 18 ("[Bryant's comment] was a gratuitous statement made three months after Stolar had submitted its investigation to the Regents. Bryant admitted the statement was not what Mills said.... Bryant's statement did not advance the investigation conducted by Stolar and served no purpose other than to further impugn the integrity of Mills."). In his supplemental brief, however, Mills argues that each of Statements A–D of the Stolar Report are false[35] and, therefore,

34. It is noteworthy that Iowa law also provides that a qualified privilege may extend to statements that are untrue, so long as the individuals making the statements do not act with actual malice. *See Thompto v. Coborn's Inc.*, 871 F.Supp. 1097, 1126 (N.D.Iowa 1994) (citing *Vojak*, 161 N.W.2d at 105). The Court will discuss "actual malice" *infra*, when it

analyzes whether Defendants abused the qualified privilege.

35. Mills relies on the same arguments supporting falsity as he did in regard to his defamation and false light invasion of privacy claims, i.e., other University employees did not believe there was a "culture of a lack of

are outside the identified interest of Defendants in finding out the "truth." Pl.'s Supp. Br. at 9–12. Mills further contends that Statements A–D are outside the scope of the identified interest "because Stolar's investigation started with a bias against Marc Mills" as evidenced by the fact that several comments were made by Advisory Committee and Board members to Stolar representatives about a general perception that Mills was either being investigated or should be fired.[36] *Id.* at 12.

Plaintiff's arguments are not convincing. Regarding Plaintiff's assertion that Bryant was acting outside the scope of his identifiable interest, there appears no dispute that the Board released Stolar's notes about the investigation and requested that Stolar personnel be responsive to media requests. *See* Defs.' App. at 87 (Bryant testifying in deposition that he made the statements in question "in response to our documents being made public and questions about those" and that "[t]he Board of Regents made it explicitly clear with us when they hired us that we were expected to be responsible to the media, to return their calls and to cooperate, and be transparent"). Regarding Plaintiff's claims that Statements A–D in the Stolar Report exceeded the interest to uphold, the Court reiterates its conclusion discussed throughout this Order that there is no evidence in the record that would support a belief that Defendants knew that any statement made in the Stolar Report or to the media was

false, or that Defendants acted with reckless disregard for the truth or falsity of their statements. Finally, Plaintiff's citations to emails of Board members and to Bryant's notes about comments by the Board and Advisory Committee simply do not support a conclusion that Defendants exceeded the bounds of their interest.

### 3. *Limitation of publication.*

■ Plaintiff's final argument against the existence of a qualified privilege is premised on the fact that Defendants disclosed the report to the Board at a public meeting. Pl.'s Br. at 18. According to Plaintiff, the qualified privilege "does not extend to statements made to the general public." *Id.* (citing *Wright v. Keokuk Cnty. Health Ctr.,* 399 F.Supp.2d 938, 953 (S.D.Iowa 2005)). The Court finds this argument unconvincing for several reasons. First, while Defendants did disclose the Report to the Board during a public session, Defendants were requested to do so by the Board. Second, the Report itself—which notably contains the statements about which Mills complains—was not disclosed to the public during the Board meeting; rather, the Board itself later disclosed the document to the public on its website. Third, disclosing a Report to the Board during a public meeting is not equivalent to a direct disclosure to the public. Finally, the circumstances of this case—involving a highly publicized sexual

---

transparency at the University General Counsel's Office," McCormick reached different conclusions in his expert report than those in the Stolar Report, etc. *See* Pl.'s Supp. Br. at 10–11.

36. The evidence that Mills cites to is discussed extensively by both parties in their supplemental briefing. In general, Plaintiff references a notation in Bryant's notes that Mills was "not good," a reference in Bryant's notes to "GC firing," an email from Board member Ruth Harkin to Stolar stating, "I

thought we were investigating Mills," and the fact that Board member Michael Gartner could not affirm or deny whether he wrote a "Civic Skinny" article in *Cityview* newspaper that was critical of Mills and questioned whether he would be terminated from the University. *See* Pl.'s Supp. Br. at 12; Defs.' Supp. Br. at 4–8. The Court has carefully reviewed both parties' supplemental briefing, but cannot conclude that Plaintiff's "new" evidence aids him in any way in resisting Defendants' request for summary judgment.

assault incident and allegations of a cover-up by a public State institution—demonstrate that disclosure of the Report to the Board at a public meeting was consistent with the ultimate interests the University hired Stolar to uphold, i.e., transparency and accountability to the public. In these circumstances, the Report's disclosure was on a proper occasion, in a proper manner, and to proper parties only for purposes of the qualified privilege. *See, e.g., Cowman v. La Vine*, 234 N.W.2d 114, 124–25 (Iowa 1975) (finding city council member entitled to qualified privilege for statements made about police chief's criminal history at a city council meeting).

### 4. *Abuse of qualified privilege.*

For the reasons stated, the Court finds that Defendants are entitled to a qualified privilege protecting their communications of the allegedly defamatory statements in this case. Nonetheless, "qualified privilege is a defeasible immunity from liability; that is, a qualified privilege may be defeated under certain circumstances." *See Barreca*, 683 N.W.2d at 117. In particular, a qualified privilege is "lost when it is abused," such as when a defamatory statement is published with "actual malice." *Id.* Here, Plaintiff again relies on solely on McCormick's expert witness report as supporting a conclusion that Defendants acted with actual malice. *See* Pl.'s Br. at 18 ("[I]f it is found that Stolar and Bryant are protected by the qualified privilege, they have abused the privilege by acting with malice, by publishing the statements excessively, and by publishing the statements to persons not having a legitimate interest in the subject.[37] The evidence of malice is detailed in the Report of Mark McCormick. . . .").

In *Barreca*, the Iowa Supreme Court adopted the actual malice standard of *New York Times v. Sullivan* for cases where an abuse of qualified privilege is alleged. *Barreca*, 683 N.W.2d at 120. *Barreca* provides that "[a]ctual malice occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity." (citing *Taggart v. Drake University*, 549 N.W.2d 796, 804 (Iowa 1996), citing in turn *New York Times*, 376 U.S. 254, 84 S.Ct. 710 (1964)). The question of whether a defendant acted with actual malice is "ordinarily a matter for the jury." *Id.* at 123. Nonetheless, to support an inference of actual malice, there must be " 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. . . . [T]he actual malice standard require[s] a high degree of awareness of . . . probable falsity.' " *Id.* at 123 (quoting *Caveman Adventures UN, Ltd. v. Press–Citizen Co., Inc.*, 633 N.W.2d 757, 762 (Iowa 2001)).

The Court does not believe a genuine issue regarding this high degree of awareness of probable falsity is raised by the mere fact that Plaintiff has employed an expert who reached different conclusions about Mills' role in the University's response to the Student Athlete's sexual assault than did Defendants. Plaintiff has not pointed to one *substantive* piece of evidence in the record that would support a conclusion that Defendants made any of the allegedly defamatory statements "with knowledge that [they were] false or with reckless disregard for [their] truth or falsity." While the Court acknowledges its obligation to construe every reasonable inference in the light most favorable to Plaintiff, there is, simply put, *no* evidence

---

37. To the extent that Plaintiff also claims an abuse of privilege by excessive and improper publication, the Court has already addressed these arguments in its analysis of whether Defendants are entitled to the qualified privilege in the first instance.

to support the inference suggested by Plaintiff. Accordingly, Plaintiff has not shown that there exists a genuine issue of material *fact* that Defendants acted with actual malice.[38] Summary judgment in favor of Defendants is warranted.

### D. *Interference with Contract (Count VII)*

In Count VII of his Amended Complaint, Mills asserts that: 1) he "had a contract or expectancy of continued employment with the University of Iowa"; 2) Defendants knew of Mills' contract or expectancy; 3) Defendants "intentionally and improperly interfered with Mills' contract or expectancy of continued employment ... by conducting an inadequate investigation of Mills' involvement in the University investigation and falsely stating that Mills had a conflict of interest and micromanaged the University investigation"; 4) Defendants' interference caused the University to terminate Mills' employment; and 5) Mills was damaged by Defendants' interference with his contract or expectancy of continued employment.

To sustain a claim for interference with contract, Mills must prove: 1) he had a contract with the University; 2) Defendants knew of Mills' contract; 3) Defendants intentionally and improperly inter-

fered with Mills' contract; 4) Defendants' interference caused the University not to perform; and 5) Mills was damaged. *See Kern v. Palmer Coll. of Chiropractic,* 757 N.W.2d 651, 662 (Iowa 2008). In support of these elements, Mills vehemently argues that his acceptance of the offer of employment in Skorton's July 28 Letter demonstrates that he had a "written employment contract providing that he would serve for an initial term of not less than five years." Pl.'s Facts ¶ 4, Pl.'s Br. at 23. On October 3, 2012, however, the Court conducted an extensive analysis of Mills' position in this regard and rejected it, concluding that he maintained only an at-will employment relationship with the University.[39] *See* Clerk's No. 111 at 23–28 ("[T]here is no genuine issue of material fact on the question of Plaintiff's employment status with the University. He was an at-will employee.") (*citing Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d 275, 280 (Iowa 2000) ("Absent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will")). Given that the facts underlying the Court's October 3 determination and the present question of Mills' employment status are identical, the Court hereby incorporates and adopts by

**38.** The Court's conclusion that Plaintiff has not shown any "actual malice" by Defendants also is pertinent to and supports summary judgment in favor of Defendants on Plaintiff's Count III claims even in the absence of a qualified privilege. Defendants urge that Plaintiff must meet the higher standard of "actual malice" to succeed on his false light invasion of privacy and defamation claims because he is a public official. *See* Defs.' Br. at 26–27. The Court agrees. *See N.Y. Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("The constitutional guarantees require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves

that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."). Despite Plaintiff's arguments that he was "dragged unwillingly into the controversy," Pl.'s Br. at 19, the Court concurs with Defendants that the facts and circumstances of this case support a conclusion that Plaintiff was a public figure for purposes of his claims. *See* Defs.' Reply at 4.

**39.** The Court's prior analysis was made in ruling on related competing motions for summary judgment filed by Mills and the State of Iowa, Mason, Campbell, and True. *See generally* Clerk's No. 111.

reference its prior analysis and conclusions.

■ Since Mills was an at-will employee of the University, he cannot sustain a claim for interference with contract. Rather, his claim must be characterized as one for interference with a prospective advantage or business expectancy. *See Water Dev. Co. v. Bd. of Water Works*, 488 N.W.2d 158, 162 (Iowa 1992) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129, at 996 (5th ed. 1984)). While such a claim "calls for evidence on the same elements as [an interference with existing contract claim] relative to *future* business," *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 114 (Iowa 1991), the required "proof is more demanding than when the claimed interference is with an existing contract." *Water Dev. Co.*, 488 N.W.2d at 162. In particular, a claim for interference with a prospective advantage or business expectancy requires "substantial evidence" that "the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff." *Willey v. Riley*, 541 N.W.2d 521, 526–27 (Iowa 1995).

> If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability. *Harsha* [*v. State Sav. Bank*], 346 N.W.2d [791,] 799 [ (Iowa 1984) ]. The substantial evidence rule in Iowa requires that the circumstances have "'sufficient probative force to constitute the basis for a legal inference, and not for mere speculation.'" *Id.* at 800 (quot-

ing 32A C.J.S. Evidence § 1039, at 753–54 (1964)). "Circumstances are not sufficient when the conclusion in question is based on surmise, speculation or conjecture." *Id.*

*Willey*, 541 N.W.2d at 527.

Defendants assert that Mills cannot establish the third and fourth elements of an interference claim,[40] i.e., that Defendants intentionally and improperly interfered with Mills' expectation of continued employment with the University, and that such interference caused the University to terminate Mills. *See generally* Defs.' Br. at 35–46. Moreover, Defendants emphasize that Mills also "cannot show that Stolar's and Bryant's 'predominant or sole motive' in issuing its Report was to damage Plaintiff's at-will employment relationship with the University." Defs.' Br. at 35.

Mills agrees that the primary points of contention are the third and fourth elements of an interference claim, but does not address Defendants' argument regarding "predominant or sole motive."[41] Pl.'s Br. at 25 ("[T]he issue before the court is whether there is a genuine issue of fact regarding whether Defendants intentionally and improperly interfered with the contract and whether the interference caused the termination of the contract."). As to the third and fourth elements, Mills argues:

> Stolar and Bryant inaccurately criticized Mills in the Report by stating that Mills micromanaged or led the University's

---

**40.** Defendants more broadly claim that, "as a matter of law, Plaintiff cannot establish each of the five elements" of an interference claim. Defs. Br. at 35. Defendants, however, do not make any particular argument regarding the first, second, or fifth elements of the traditional claim. *See generally id.* at 34–46.

**41.** Mills maintains in his brief that he had a written contract with the University and that

his claim should be analyzed as an interference with existing contract claim. *See* Pl.'s Br. at 25 ("As stated above, at a minimum, a genuine issue of fact exists regarding whether Mills had a contract with the University."). Mills' Brief contains argument solely in accord with this position, and does not respond to or even mention the heightened evidentiary requirements applicable to claims of interference with an at-will employment position.

response to the sexual assault incident, that Mills had a conflict of interest in dealing with the father, and that Mills['] response to the incident was consistent with a culture of a lack of transparency. Mark McCormick stated in his opinion that "The [Stolar] report is reckless in its inaccurate and unfounded allegations against Marc Mills. The trier of fact could conclude that the Stolar Partnership determined to make Marc Mills a scapegoat." This evidence raises a genuine issue of fact as to whether Stolar and Bryant intentionally and improperly targeted Mills as having acted inappropriately during the University's response to the sexual assault incident, thereby providing the reason for his termination from employment. . . . [42]

Finally, a genuine issue of fact exists that the statements of Stolar and Bryant caused the University to terminate the employment of Marc Mills. David Miles, Regent President, testified that he based his conclusions regarding Mills' credibility and employment at the University on the Stolar Report. Sally Mason testified she began considering the termination of Mills after the release of the Stolar Report. She testified further that she believed the Regents expected her to take specific action after the release of the Report. As demonstrated by the testimony of Miles and Mason, the statements of Stolar and Bryant played a causative role in Mills' termination from employment.

Pl.'s Br. at 25–26.

 The Court finds Mills' arguments unconvincing. Even assuming that Mills has adequately substantiated the fourth element of his claim, there simply is no genuine issue of material fact as to the third element. First, the record is devoid of any evidence that Defendants "intentionally" interfered with Mills' expectation of continued employment. *See Green v. Racing Ass'n of Cent. Iowa,* 713 N.W.2d 234, 244 (Iowa 2006) (stating that interference "must be both intentional *and* improper" (emphasis modified from original)); *Hill v. Winnebago Indus., Inc.,* 522 N.W.2d 326, 328 (Iowa Ct.App.1994) ("Interference with a contract is intentional if the defendant either interferes with the contract on purpose or knows the conduct is substantially certain to interfere with the contract." (citing Restatement (Second) of Torts § 766 cmt. j (1979))). Mills has not pointed to a single record citation that would support a conclusion that either Stolar or Bryant had any intent to interfere with Mills' employment with the University. Indeed, Mills admits that Stolar was retained by the Advisory Committee of the Board "to conduct an investigation of the responses and actions of the University of Iowa, its administration, departments and personnel to an alleged sexual assault of a University student/athlete on October 14, 2007," that neither the Board nor the Advisory Committee asked Stolar to "make any recommendations as to the continued employment of any persons employed by the University," and that "Stolar did not form any opinions on [the subject of any University employee's continued employment]." *See* Defs.' Facts ¶¶ 15, 18; Pl.'s Resp. to Defs.' Facts ¶¶ 15, 18. Moreover, although she admits having tak-

---

42. Mills goes on to argue that Stolar has refused to produce certain discovery pursuant to the attorney-client privilege, and that "[i]f the [Advisory] Committee identified Mills to Stolar as someone that should be targeted for criticism, there will be additional evidence that Stolar and Bryant acted intentionally and improperly to interfere with Mills['] employ-

ment." Pl.'s Br. at 26. Stolar ultimately did disclose the disputed discovery materials to Mills, but Mills' Supplemental Memorandum does not contain any citations to evidence or additional argument regarding the Count VII interference claim. *See generally* Pl.'s Supp. Mem. (Clerk's No. 113).

en the Stolar Report into account in her decision, it was Mason who terminated Mills' employment with the University, not the Board or the Advisory Committee. Pl.'s Facts ¶¶ 35, 56; Defs.' Resp. to Pl.'s Facts ¶¶ 35, 56. Even if Mills and his expert are correct that the findings of the Stolar report are inaccurate, this fact would still be many steps removed from supporting anything more than jury speculation that Defendants "intended" to interfere with Plaintiff's employment. *See Chaney v. Smithkline Beckman Corp.*, 764 F.2d 527, 529–30 (8th Cir.1985) ("The jury ... is not permitted to speculate about the substantive elements of a case."); *Iowa Power & Light Co. v. Stortenbecker*, 334 N.W.2d 326, 331 (Iowa Ct.App.1983) (finding that an expert's opinion is only competent where the facts underlying it are "sufficient for the witness to reach a conclusion which is more than mere conjecture or speculation").

Second, even assuming that Defendants may have harbored some intent to interfere with Mills' employment, the record is still deficient of any evidence that there was any "improper" interference with Mills' employment. *See Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) (quoting Restatement (Second) of Torts § 767 cmt. d) ("If there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper."). Factors that are to

be considered in determining whether interference is improper include: 1) the nature of the conduct; 2) Defendants' motive; 3) the interests of the party with which the conduct interferes; 4) the interest sought to be advanced by Defendants; 5) the social interests in protecting Defendants' freedom of action and the contractual interests of the other party; 6) the nearness or remoteness of Defendants' conduct to the interference; and 7) the relations between the parties. *See Green*, 713 N.W.2d at 244; *Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 853 (Iowa 1990) (citing Restatement (Second) of Torts § 767 (1979)). Here, it is undisputed that Stolar was retained by the Board via the Advisory Committee to conduct an independent evaluation of the University's handling of the Student Athlete's sexual assault, that Defendants and Mills had no prior knowledge of one another, that Stolar prepared the Report for the benefit of and at the behest of its clients (the Advisory Committee and the Board), that the Stolar Report was critical of several individuals and entities in addition to Mills,[43] and that Stolar did not offer any advice or recommendation regarding any individual's employment with the University. *See* Defs.' Facts ¶¶ 15, 24, 25, 30; Defs.' App. at 106–284 (the Stolar Report). Under these circumstances, no reasonable jury could conclude that Defendants "improperly" interfered with Mills' employment with the University.

Finally, as the Court previously stated, because Mills was an at-will employee of the University, he must do more than show mere intentional and improper interference; he must provide "substantial evi-

---

**43.** The Stolar Report contains a section entitled "Compliance with University Policies and Procedures," wherein the performance of various University Departments and personnel is evaluated in light of the Defendants' investigation. *See* Defs.' App. at 138–72. In addition to the criticisms of Mills, the Report discusses an "egregious communication failure" and a "less than thorough investigation" by Athletics, other communications failures concerning Athletics and EOD, "questionable judgment" by Fred Mims, and several "failures" in responding to the incident by Jones, amongst other things. *See generally id.*

dence that the defendant's predominant or sole motive was to damage" him. *Compiano v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 462, 464 (Iowa 1999). There simply is no such evidence. Indeed, to the extent that the record is lacking in proof that Defendants "intentionally" or "improperly" interfered with Plaintiff's University employment, it is even more deficient as to this higher standard of required proof.[44]

## IV. CONCLUSION

For the reasons discussed herein, the Court finds there are no genuine issues of material fact on any of Plaintiff's claims against Defendants Stolar and Bryant. Defendants' Motion for Summary Judgment (Clerk's No. 71) is, accordingly, GRANTED.

IT IS SO ORDERED.

---

44. In their brief, Defendants undertake an extensive analysis of *Kern*, citing it for the propositions that "interference without bad motive is not actionable" and "malice without causation is not actionable." Defs.' Br. at 36–46 (citing *Kern*, 757 N.W.2d at 651). Although the Court does not discuss *Kern* in-depth in this Order, it found Defendants' discussion and analysis of *Kern's* applicability to the present case compelling and incorporates that discussion and analysis herein as supportive of summary judgment in favor of Defendants on Count VII.